**Billie BAILEY, Defendant Below, Appellant,**

v.

**The STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: July 14, 1982.

Decided: Sept. 7, 1982.

---

Dennis A. Reardon (argued), Asst. Public Defender, Dover, for defendant-appellant.

Dana C. Reed (argued), Deputy Atty. Gen., Dover, for plaintiff-appellee.

Before McNEILLY, QUILLEN and MOORE, JJ.

QUILLEN, Justice:

Several issues have been raised in this appeal. We divide them into two groups, those relating to the defendant's conviction of forgery in the second degree and those relating to the defendant's sentence as an habitual criminal.

I

The defendant was convicted of forgery in the second degree. In pertinent part, our forgery statute, 11 *Del.C.* § 861, reads as follows:

"(a) A person is guilty of forgery when, intending to defraud, deceive or injure another person, or knowing that he is facilitating a fraud or injury to be perpetrated by anyone, he:

(1) Alters any written instrument of another person without his authority; or

(2) Makes, completes, executes, authenticates, issues or transfers any written instrument which purports to be the act of another person, whether real of fictitious, who did not authorize that act, or to have been executed at a time or place or in a numbered sequence other than was in fact the case or to be a copy of an original when no original existed; or

(3) Possesses a written instrument, knowing that it was made, completed or altered under circumstances constituting forgery."

If the written instrument is a check, the crime is forgery in the second degree, a class E felony.

As to the pertinent facts, the defendant went to a liquor store with a check purportedly endorsed by the payee, one June Davis, but in fact with the endorsement forged by

one Daniel Pregent, who had stolen the check. Pregent requested the defendant to cash it. The clerk at the liquor store was handed the check but handed the check back to the defendant. The clerk did not cash it but he did notice Ms. Davis' purported endorsement. The defendant later deposited the check in his own account. But he is charged for his act at the liquor store, not the bank.

Two matters are raised with regard to defendant's guilt under this factual sequence. First, defendant contends there was insufficient proof of "intending to defraud". Second, the question has arisen in the Court's mind as to whether the defendant "transfer[red]" the check as that term was contemplated by the draftsmen of the statute.

■ As to the first matter, the question is simply evidentiary. A detective testified as to out-of-court statements by the defendant. Initially, the following exchange occurred as part of the detective's examination:

"Q. Did [the defendant] say who signed June Davis' name?

A. All he said was, 'Danny.' He said, 'I did not sign her name. All I signed was my name.' "

Later the detective testified in response to another question:

"Q. What did he state concerning Danny?

A. He said, 'Danny is the one who signed June Davis' name.' "

A third question and answer were as follows:

"Q. Detective Cox, did Bailey tell you that Danny signed it at the bank or up at the liquor store?

A. He didn't tell me either. He just said, 'Danny is the one who signed her name.' "

Given the above testimony, there was sufficient evidence to show that the defendant knew the payee's endorsement was forged and sufficient evidence for the jury to infer that the defendant intended to defraud the liquor store when he tried to cash the check.

The second question with regard to the statutory word "transfers" is a legal one of definition. There is no dispute as to the pertinent facts. The check was tendered but the tender was rejected. The check was not cashed. It was returned. Under these circumstances, did the defendant "transfer" the check?

■ There is no statutory definition of the word "transfers" as it appears in § 861. Thus, it should be defined in "its commonly accepted meaning". The verb "transfer" has been defined in two common ways: (1) "[t]o convey or shift from one person or place to another" or (2) "[t]o make over the possession or legal title of to another". *The American Heritage Dictionary of the English Language,* New York 1969. In one sense, the check in this case was shifted from one person to another and then back again. But in no sense was there a transfer in terms of passing of title.

■ Our first reaction was that the word "transfer" would refer to a completed cashing of the check. Indeed this would be the *normal commercial meaning.* See the Uniform Commercial Code, 6 *Del.C.* § 3–201(1). But, upon examination, we think the physical delivery of the check for cashing is sufficient under the forgery statute to constitute transferring the instrument.

In the first place, the Criminal Code Commentary on § 861 specifically says: "No actual injury or loss need result from *any* of the acts for the crime to be completed." Emphasis added. *Delaware Criminal Code with Commentary* 1973, p. 296. Thus, there was an express recognition by the draftsmen of the forgery statute that a cashing of the check was not necessary.

■ In the second place, the Commentary summarizes the three subsections of § 861 as follows:

"The criminal act may be of three sorts: (1) alteration of another person's written instruments, (2) making or uttering a written instrument, purporting it to be what it in fact is not, either in respect to its signer, the time, place, or sequence of

its execution, or its authenticity, and (3) possession of any forged instrument knowing it to be forged."

It seems to us important that the draftsmen reduced the statutory language in subsection 861(a)(2) from "[m]akes, completes, executes, authenticates, issues or transfers" to "making or uttering". With regard to forged instruments, the word "utter" has a clear meaning. "A forged instrument is uttered when it is offered to another as genuine, without regard to whether it is so accepted." 4 *Wharton's Criminal Law* (14th ed. 1981) § 515, p. 153. "A person is guilty of uttering a forged instrument ... when he presents a forged check for payment ...." *Id.* at 154. Our own case law echoes the general authority:

> "To 'utter' ordinarily means to declare or assert directly or indirectly by words or actions that a thing offered (as an instrument) is genuine or good; * * to make use of, to offer; to pass off; * * to put forth; to put in circulation; to put out. 66 C.J. 382; see also State v. Anderson, 1 Boyce 135, 74 A. 1097; Web.New.Inter. Dict.
>
> Usually, the mere offer of a check to a person is, therefore, to utter it, whether it be accepted by that person, or not. People v. Caton, 25 Mich. 388; Girdley v. State, 161 Tenn. 177, 29 S.W.2d 255."

*State v. Vandenburg,* Del.Gen.Sess., 2 A.2d 916, 921 (1938). See also the jury charge of Judge Woolley in *State v. Anderson,* Del. Gen.Sess., 74 A. 1097, 1099 (1910). In addition to the Commentary's use of the word "utter" as a summary verb, there is nothing in the tenor of the comment to suggest that there was any intent to restrict the concept of forgery. To the contrary, the Commentary on § 550–52 suggests an intent to paint with a broader brush than the prior Delaware law. See particularly the definition of "written instrument" in § 552.

Finally, it appears that § 550 had its source in the Model Penal Code and the former provisions of the New York Penal Code. See *Proposed Delaware Criminal Code* (1967), Appendix C, p. 502. Unfortunately the section was not drawn as iron-

clad as the Model Penal Code which specifically included a section on uttering forged writings. See *Model Penal Code and Commentaries,* (American Law Institute 1980), Part II, § 224.1(c), p. 281. But the history shows that the word "utter" in an early draft was defined "to mean to 'issue, authenticate, transfer, publish, or otherwise give currency to a forged writing or object.'" *Id.* at 301. Thus it is understandable that the draftsmen of our statute equated the final verbs used in our statute with the concept of uttering.

In view of the above considerations, we think the crime of forgery has been committed in that the delivery of the check to the liquor store clerk for cashing constituted a transfer.

## II

The remaining claims of error relate to the sentencing of the defendant as an habitual criminal. See the recent review of our statute in *Oney v. State,* Del.Supr., 446 A.2d 389 (1982). For present purposes, the applicable habitual criminal statute subsection, 11 *Del.C.* § 4214(a), reads in pertinent part:

> "(a) Any person who has been 3 times convicted of a felony, ... and who shall thereafter be convicted of a subsequent felony ... is declared to be an habitual criminal, and the court in which such fourth or subsequent conviction is had, in imposing sentence, may, in its discretion, impose a life sentence upon the person so convicted."

The procedure is set out in 11 *Del.C.* § 4215(b):

> "If, at any time after conviction and before sentence, it shall appear to the Attorney General or to the Superior Court that, by reason of such conviction and prior convictions, a defendant should be subjected to § 4214 of this title, the the Attorney General shall file a motion to have the defendant declared an habitual criminal under § 4214 of this title. If it shall appear to the satisfaction of the Court at a hearing on the motion that the defendant falls within § 4214 of this title,

the Court shall enter an order declaring the defendant an habitual criminal and shall impose sentence accordingly."

In order to put the sentencing in this case in factual perspective, it should be noted initially that the sentencing occurred on June 22, 1979, approximately one month after a double murder in Kent County. The defendant had been charged in May 1979 with this double murder and was indicted on these new offenses on July 2, 1979. These events help explain the context of the legal issues raised.

It is argued in this appeal that no "hearing" was held as required by this subsection. It appears that the State filed the requisite motion with copies of the Prothonotary's records showing the prior convictions and that the Court considered the motion and the imposition of sentence at the same time. Furthermore, it appears that defense counsel did raise a denial as to the prior convictions although this appears in the record to be somewhat perfunctory and technical. Indeed, at one point, defense counsel acknowledged "according to the record he qualifies." Defense counsel in a single statement covered both the status of the defendant and the discretion of the Court as to sentence. The transcript of the June 22, 1979 hearing then shows the following conclusion:

"THE COURT: The photocopies of the Docket and the entries indicate that he has enough felonies to be sentenced as a habitual criminal, and I am convinced by the photocopies of the Docket and take judicial notice of the records of this Court.

Do you have anything to say?

THE DEFENDANT: No, sir.

THE COURT: This presentence report was completed January 10, 1979. Within a few weeks after that, I reached the decision as to the sentence I would impose, many months before the present charges against him.

It is the sentence of this Court that you pay the costs. They are suspended. Under the provision of Title 11, Section 4214, Section A that you be in prison for the remainder of your life, beginning August 24, 1978.

You are committed to the custody of the Division of Adult Correction until this sentence can be carried out."

Three separate issues arise from the defendant's "no hearing" argument. First, was there a hearing as contemplated by the statute? Second, was there an adequate record of the prior felonies? Third, what significance should be attached to the sentencing judge's comments as to when he reached his discretionary decision on the life sentence?

■ We think the statute and its reference to procedural activity "at any time after conviction and before sentence" contemplates a separate hearing on a separate motion prior to sentencing to determine the defendant's status as an habitual criminal. We do not think that this interpretation is merely a technical requirement. A factual determination that the defendant is an habitual criminal is a significant adjudication which requires a separate focus by a responsible and impartial fact-finding judge. Moreover, we think the atmosphere surrounding such a hearing is important. The hearing should be conducted with order, decorum, patience, dignity and courtesy. The impression should not be given, and the fact should not be, that the issue is being treated cavalierly.

■ By these standards we find the hearing held in this case fell short. While we do not see why the status hearing and the sentencing hearing cannot be held on the same day, especially when everyone is in agreement, the two should be kept separate as the statute contemplates. The hearing also should be conducted in such a manner that it is clear that the prior convictions are subject to a trial adjudication. In this case, the subject was covered with the following exchange between defense counsel and the Court:

"MR. REARDON: Your Honor, as to the declaration of habitual offender, I believe the Defendant is entitled to some sort of evidentiary hearing on that. If

Your Honor is anticipating, possibly he would be looking at life as a habitual offender.

THE COURT: Are these denied? I presided at most of them.

MR. REARDON: Your Honor, when I originally talked to Mr. Bailey concerning these, yes, there was a denial.

THE COURT: Of what?

MR. REARDON: Some of the charges against him. He wanted to have that verified; wanted to see the records. He didn't believe all those were there.

THE COURT: All right."

The next reference to the subject of prior convictions is the Court's finding previously quoted. While the vagueness of the "denial" is admittedly somewhat difficult to handle, the matter should have been put more precisely in focus by the Trial Judge through a formal adjudication. We think that the future conduct of such hearings should reflect the concerns we have expressed.

■ But, having said all of that, we cannot find any substantive basis for reversal of the declaration that the defendant is an habitual criminal. Hearing both the status and the sentencing matters at the same time, while procedural error in our view, is akin to a normal exercise of discretion by a trial court. While defense counsel alludes to the possibility that the record of prior convictions could refer to another person of the same name as the defendant, nothing is offered to suggest this is the case and its likelihood appears nil. The defense was on notice by the State's motion to sentence as an habitual offender, filed January 10, 1979, over five months before sentencing, of the precise records upon which reliance was being placed. Judicial notice by the Superior Court of its own records to establish prior judgments is proper. *Delaware Uniform Rules of Evidence,* Rule 202(d)(1)(B). The record establishes that there was in fact a hearing. If the hearing fell short of the statutory ideal, which we believe it did, its shortcomings are clearly harmless insofar as the determination of habitual criminal status is concerned. Indeed, there is no reason to doubt that the State established that the instant conviction not only properly triggered the statute but was indeed the defendant's seventh felony conviction.

■ The defendant next argues that the Court erred because his sentencing as an habitual offender was the result of selective enforcement of the statute. While one is tempted to inquire if one convicted seven times of a felony has the standing to raise the argument, it would appear that the argument is effectively foreclosed by our decision in *Ward v. State,* Del.Supr., 414 A.2d 499 (1980). Nothing in this record demonstrates deliberate selection "upon an unjustifiable standard such as race, religion or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453 (1962).

Finally, we must deal with the contention that, since the sentencing judge announced from the bench that he made up his mind as to the discretionary sentence some time before the hearing, the sentence is legally improper. In order to put this rather unusual comment in perspective, it should again be noted that the defendant had been charged with a double murder which occurred between his conviction and his sentence in the instant case and the Trial Judge was negating the suggestion that the new charges were influencing his sentencing judgment on this conviction. Moreover, this is not a case like *Osburn v. State,* Del.Supr., 224 A.2d 52 (1966) where the Sentencing Judge announced he would not even have let the defense counsel speak on his client's behalf. Here, the defense counsel on invitation of the Court did speak and the defendant, as provided by Superior Court Criminal Rule 32(a), was given an opportunity to speak.

But that does not end the matter. The *Osburn* opinion, 224 A.2d at 53, is quite specific and precise in its demands of the Sentencing Judge. The Court noted that "Criminal Rule 32(a) provides in part as follows: ' * * * Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in

mitigation of punishment.' " The Court then said:

"We think the summarized version of what took place at the time of sentencing clearly indicates that the sentencing judge had a 'closed mind' on the subject before the proceedings started. This fact alone was a violation of the intent, purpose and spirit of Criminal Rule 32(a) which requires, by necessary implication, that before finally reaching a decision as to sentence, the sentencing judge have an open mind at least to the extent of receiving all information bearing on the question of mitigation. Cf. *Green v. United States*, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670.

We think it not improper for a sentencing judge to mount the bench with some preconceived notion about the proper sentence to be imposed, but we think it quite improper for him at that point to have closed his mind upon the subject. When such is the case, due process is lacking and the sentence must be struck and the cause remanded for the imposition of sentence in the proper fashion."

■ Since the Sentencing Judge in this case announced that "many months" before sentencing "[he] reached the decision as to the sentence [he] would impose", this Court has no option under *Osburn* but to require resentencing.

### III

Insofar as this appeal attacks the conviction of forgery in the second degree, a felony, the conviction is affirmed. Insofar as this appeal attacks the order declaring the defendant an habitual criminal, such declaration is affirmed. Insofar as the appeal attacks the discretionary sentence under 11 *Del.C.* § 4214(a), the cause is remanded with instructions to strike the sentence and with further instructions directing the imposition by a different judge of sentence upon the defendant.