STATE of South Dakota, Plaintiff
and Appellee,

v.

Myria WARREN, Defendant
and Appellant.

No. 16721.

Supreme Court of South Dakota.

Argued April 24, 1990.

Decided Oct. 31, 1990.

Sherri Sundem Wald, Asst. Atty. Gen., Pierre, (Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief), for plaintiff and appellee.

Jeffrey L. Viken of Finch, Viken, Viken & Pechota Rapid City, for defendant and appellant.

MILLER, Justice.

Myria Warren appeals her conviction of three counts, each, of grand theft by transfer and grand theft by exploitation. We affirm in part and reverse in part.

FACTS

From 1917 until 1972, John Edward Hess operated a sheep ranch in Harding County, South Dakota. In 1972, he ceased his ranching operation. Shortly thereafter, he moved to Belle Fourche, South Dakota. In 1976, he sold his 1864–acre ranch for $70 per acre.

Warren had been operating an elderly care business in her home in Belle Fourche since 1973. She generally provided room and board to elderly people who were unable to live alone. She first met Hess in 1984. At that meeting, she informed him she would provide him with room and board for $400 a month. Hess subsequently moved into Warren's home on June 8, 1984. At the time, he was eighty-nine years old, wearing a hearing aid, had grad-

ually deteriorating eyesight, and ultimately became dependent on a walker and wheelchair for mobility. His overall general health was poor.

Hess had only two living relatives, nephews Kenneth Hammer and A.C. Grudum. Since 1983, Hammer and his family had visited Hess at least once and sometimes twice a year. After Hess moved into the Warren home, they would call at least once a month checking on his health, knowing that it was deteriorating. Grudum had never met his uncle until June, 1987.

In March, 1986, Hess began having problems with his heart. He was taken to the Ft. Meade Veterans Hospital near Sturgis, South Dakota, where he was examined. Due to his heart condition, he was flown to a veterans hospital in Denver, Colorado, where a pacemaker was implanted. Warren testified that she accompanied Hess to Denver at his request. He had allegedly offered to pay her $500 to cover her expenses. After his discharge from the Denver hospital, he spent one night in the Ft. Meade Hospital for observation and then returned to Warren's home.

Hammer and his wife testified at trial to events surrounding their contacts with Hess and various conversations they had with Warren. Hammer testified that between June and August, 1986, he and his wife, on extension phones, called Warren to inquire into his recovery from the pacemaker surgery. Hammer testified that Warren informed them that she had started levying extra monthly charges of $500 against Hess "for bedwetting." Mrs. Hammer testified that during this telephone conversation, Warren laughed and stated that she figured out how to make Hess do what she wants, "just make him pay more money." Hammer testified that he called Warren in February, 1988, again inquiring about his uncle, and Warren informed him that Hess was angry with her for charging him another $1,000 for bedwetting.[1] Hess' attorney, Donn Bennett, confirmed similar conversations with Warren. Mrs. Hammer testified that during a visit in April, 1986, Warren informed her that Hess protested every time she asked him to sign his rent check because it had gone up from $400 to $1,000 a month. She also recalls Warren stating that, "I figure I just as well get all I can out of him because its all going for taxes anyway." Additionally, she recalls Warren stating that she would like to get Hess to pay off the mortgage on her house. Mrs. Hammer testified that during a visit in September, 1987, Warren informed her that she had brought three of Hess' matured certificates of deposit (CD's) home from the bank to get Hess' signature in order to cash them.[2] Warren testified that she could not take him to the bank every time CD's became due.

Regarding Hess' health, Mrs. Hammer testified that during a visit in April, 1988, when she and her husband had arrived at Warren's home, Hess was lying in bed. They noticed that he was lying on his back, his lips were badly swollen, his breathing irregular, and one foot was on the floor. Mrs. Hammer testified that he was filthy and wet, as was his bed. Warren informed them that nothing was wrong with him, that he was just sleeping. They attempted to awaken him to no avail and finally called an ambulance. He was taken to the Ft. Meade hospital, where it was discovered that he had a urinary infection which had become life-threatening.

Dr. Fredric Birch, a physician at the Ft. Meade hospital testified to events surrounding the history of Hess' health and medical attention he received at Ft. Meade. Dr. Birch testified that he first had contact with Hess on December 21, 1987, concerning episodes of apnea, i.e., absence of breathing, in addition to some heart problems.[3] Because of these problems, he was

1.  Warren testified that she did charge him extra for additional care but not specifically for bedwetting. She also testified that at the times he was wetting the bed he had been ill.

2.  Later, these CD's were found to be missing from Hess' personal effects at the time he moved out of the Warren home.

3.  It was prior to this time that Hess had the pacemaker installed.

admitted to the intensive care unit.[4] Dr. Birch testified that communication with Hess was rather difficult. A person had to "shout directly into his ear" or "write on a piece of paper in large letters" for him to read in order to communicate. He was discharged January 5, 1988. Dr. Birch also testified that Hess was readmitted on April 11, 1988, due to a life-threatening urinary infection.

Hess' other nephew, Grudum, testified to events surrounding his visit with his uncle in June, 1987. During a conversation with Warren, she indicated to Grudum that she charged Hess $900 a month for rent and other boarders only $350–$450 per month, indicating the reason for the difference was that "he can afford it." Grudum visited with Hess who made him aware that his checking account at that time was in excess of $35,000 and that his income for the previous year was over $42,000. Just prior to his leaving the Warren home, Grudum testified that Warren stated, "well, its too damn bad you have to wait until somebody dies before you can get their money, I'm going to get Ed to pay my $23,000 mortgage."

On April 12, 1988, after Hess had been hospitalized for the urinary infection previously mentioned, Hammer went back to Warren's house with a representative of Hess' lawyer to recover Hess' property. Hammer asked Warren if he did in fact have all of Hess' property, to which she replied "Yes." The following day, Hammer went to the bank to inventory and audit Hess' safety deposit box. It was discovered that three CD's were missing: one for $20,000, one for $10,000, and one for $5,000, all listed by the bank as owned by Hess. During the next month, Hammer carefully went through all of his uncle's papers. He discovered that all the checks written for the months of January and February of 1988 were missing. He eventually discovered, with the assistance of the bank, that two checks issued during those months were made payable to Warren: check # 808 for $24,000 and check # 810 for $2,000. Hammer contacted Hess' attorney, Donn Bennett, informing him of this discovery. Bennett contacted Warren, asking her if she knew the whereabouts of the missing checks and CD's. She informed him that she did not have the checks but she did have the CD's. She refused to turn them over to Bennett before consulting with her attorney.

On September 14, 1988, Warren was indicted on three felony counts of grand theft and ten misdemeanor counts of operating a health care facility without a license. On November 23, 1988, she filed a motion to quash the indictment. On December 21, 1988, State filed a dismissal of the indictment. On that same day, the grand jury reindicted Warren, adding eight felony counts of forgery, ten felony counts of grand theft by transfer of another's property, ten felony counts of grand theft by exploitation of a disabled adult (the ten felony counts of grand theft by exploitation of a disabled adult were all plead in the alternative to grand theft by transfer of another's property and were based on the same underlying facts), and ten misdemeanor counts of operating a health care facility without a license.

Prior to trial, several counts were dismissed by the trial court on ex post facto grounds. (SDCL ch. 22–46, Abuse or Exploitation of a Disabled Adult, became effective July 1, 1986. The acts complained of occurred prior to that time.) The ten counts of operating a health care facility without a license were severed for trial and ultimately dismissed by the State after the felony convictions were rendered. Warren was found guilty on three counts of grand theft by transfer, specifically Counts X, XI, and XII, and three counts of grand theft by exploitation of a disabled adult, Counts XVI–A, XVII–A, and XVIII–A. She was found not guilty of the other charges including the forgery counts. Warren appeals.

---

**4.** There was also some indication that he had been suffering from malnutrition. There was no evidence admitted at trial conclusively suggesting that this was the result of neglectful attention by Warren.

## DECISION

### ISSUE I

### WHETHER HESS WAS COMPETENT TO TESTIFY AT TRIAL.

■ Generally, every person is competent to be a witness if they have personal knowledge of the matter at hand, have sufficient understanding to receive, remember, narrate impressions and are sensible to the obligation of an oath. *State v. Lufkins*, 381 N.W.2d 263 (S.D.1986). *See also* SDCL 19-14-1 and -2. "The determination of the witness' competency is within the discretionary power of the trial judge and may be reversed only upon a showing of abuse of discretion." *Lufkins, supra* at 266; *State v. Phipps*, 318 N.W.2d 128 (S.D. 1982).

■ In *Lufkins*, the trial court held that the witness was incompetent to testify. We concluded that there had been no showing of an abuse of discretion. It was determined that the witness had lost his personal knowledge of the events in question and lacked the understanding to receive, remember, or narrate any remaining impressions.[5] That is not the situation before us.

Hess' testimony clearly exhibited that he had personal knowledge of the matter before the trial court. His difficulties were not attributed to his inability to receive, remember and narrate, but rather to a lack of physical ability which was attributed to his poor hearing and eyesight.

Dr. Daniel Kennelly, a psychiatrist, testified at the competency hearing that it was his opinion Hess could report facts, has a good remote memory, does understand what telling the truth entails and that it is important. Kennelly testified that the communication problem was basically the result of Hess' poor hearing.

Donald Janz, a psychologist, performed an evaluation and did some psychotherapy testing with Hess. He determined Hess' IQ to be in a range between 65 and 70. Mr. Janz testified that a person with that level of IQ would be mildly mentally handicapped.

Dr. Charles Lord, a psychiatrist, testified that Hess suffers from dementia, however, he does understand the concept of telling the truth. Lord testified that Hess communicates better when questions are written for him. Additionally, he testified that if matters became too complex Hess would not be able to follow them.

The trial court recognized that Hess had a diminished mental condition due to his age and low IQ. However, the court also indicated that it believed Hess' testimony would have some value to the proceedings and would be received under the special care of the court and under guarded circumstances. Additionally, the trial court specifically referred to *Lufkins*, finding that Hess could understand the obligation of an oath or the need to tell the truth.

The trial court properly guarded against complex matters presented to Hess during questioning. After reviewing his testimony, it is evident that Hess was competent to testify at trial. We find no abuse of discretion.

### ISSUE II

### WHETHER SUFFICIENT EVIDENCE EXISTED TO SUPPORT WARREN'S CONVICTION OF GRAND THEFT BY TRANSFER.

In determining the sufficiency of the evidence on appeal, the question presented is "whether there is evidence in the record, which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt.... In making this determi-

---

5. In *State v. Lufkins*, 381 N.W.2d 263, 266 (S.D. 1986), the trial court determined the witness to be incompetent. He medically suffered from "Systemic Lupus Erythematosis," chronic alcoholism, and dementia. In addition, the witness was unable to recall the day of the victim's death or that the victim was in fact dead, he had difficulty maintaining his attention span, his memory was not vivid, he was unable to recall dates and places, his memory was not in chronological order, he experienced some memory blocking, he experienced visual hallucinations, he exhibited bizarre behavior, he showed slowing of thought, sparsity of speech, and a loss of intellectual functioning.

nation, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict." *State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988) (citations omitted). *See also State v. Jenner*, 451 N.W.2d 710 (S.D. 1990).

Warren was convicted of three counts of grand theft by transfer in violation of SDCL 22–30A–2 [6] and SDCL 22–30A–17 (grand theft and petty theft distinguished). Warren contends that she could not have been convicted of this crime because there was essentially no "transfer" by her. She contends that any "transfer" which had been made was actually made by Hess. She points out that she was not convicted of the forgery counts of the indictment, thus supporting her position that Hess voluntarily signed all the checks and transferred the money to her (rather than that she had forged the checks, thereby transferring the money to herself). [7]

Warren essentially concedes that she received these amounts of money but asserts that they were gifts from Hess. With respect to Count X, a check written by Warren and signed by Hess for $1,300 in April, 1986, Warren admitted to previously receiving $700 for rent at the first of the month. She testified that she was given the extra $1,300 so that she could hire extra help in order to care for Hess. On cross-examination, she had difficulty remembering who she hired and had no recall of what she paid.

With respect to Count XI, a CD in the amount of $20,000 was originally in Hess' name alone, but was changed approximately one year later, to include Warren as co-owner. An employee at the bank where the CD was purchased testified that she made the actual transfer of ownership of the CD but does not recall ever witnessing Hess endorse or initial it for approval of transfer. She also testified that the endorsement by Hess was not necessary for a transfer of ownership but is necessary only to cash it. (This is one of the same CD's Warren refused to turn over to attorney Donn Bennett.)

Count XII dealt with a $2,000 check drawn on Hess' account on May 1, 1986, for rent. State's evidence indicates that at this time Warren's own checking account contained a minimum balance or was overdrawn. This check was also in her handwriting, but bore Hess' signature.

Theft by transfer has never been interpreted by this court concerning the element "transfer." We reject both Warren's and State's reliance on the U.C.C. for a definition of that term. In a similar vein, we do not use the definition in the Uniform Fraudulent Transfer Act found at SDCL 54–8A–1(12).

■ SDCL 2–14–1 provides that: "Words used are to be understood in their ordinary sense except also that words defined or explained in SDCL 2–14–2 are to be understood as thus defined or explained." "Transfer" is a word of conveyance. *Bensinger v. Scott*, 625 P.2d 775, 777 (Wyo.1981). Transfer means to convey or remove from one place, person, etc., to another; pass or hand over from one to another; specifically, to change over the possession or control of (as, to transfer title to land). To sell or give. Black's Law Dictionary 1342 (5th Edition 1979). *See also Chappell v. State*, 216 Ind. 666, 25 N.E.2d 999, 1001 (1940). The word "convey," when applied to the disposition of personal property, has the signification of "transfer," and means the passing of title and dominion from one person to another. *Lippman v. State*, 104 Ala. 61, 16 So. 130 (1894). *Cf. Bailey v. State*, 450 A.2d 400, 402–03 (Del.Supr.1982) (the physical delivery of a check when the defendant knew that the payee's endorsement was forged by a third person was sufficient under forgery statute to constitute transferring the instrument where, defendant requested li-

---

**6.** SDCL 22–30A–2 provides:
Any person who transfers property of another, or any interest therein, with intent to benefit himself or another not entitled thereto, is guilty of theft.

**7.** We point out that evidence or even a conviction of forgery is not an element to be proved under the statute nor is this the only means by which a transfer of money could take place.

quor store clerk to cash check but when clerk handed the check back to the defendant refusing to cash it).

Although it is clear that Warren received the funds from the checks and became co-owner of the CD, the record is totally devoid of any evidence that *she* transferred anything. In fact, as noted earlier, the jury rejected all of State's claims that she had committed any forgeries.

Her conduct may have been immoral and unthinkable and, in some states, criminal. However, given our legislative language, her conduct was not, offensive as it may seem, theft by transfer.

### ISSUE III

**WHETHER SUFFICIENT EVIDENCE EXISTED TO CONVICT WARREN OF THEFT BY EXPLOITATION OF A DISABLED ADULT.**

■ Warren was found guilty of three counts of grand theft by exploitation of a disabled adult in violation of SDCL 22–46–3, which provides:

> Any person who, having assumed the duty by written contract, by receipt of payment for care, or by order of a court to provide for the support of a disabled adult and having been entrusted with the property of that disabled adult, with intent to defraud, appropriates such property to a use or purpose not in the due and lawful execution of his trust, is guilty of theft by exploitation. Theft by exploitation is punishable pursuant to the provisions of § 22–30A–17.

"Exploitation," as that term is used in SDCL 22–46–3, is defined as, "the wrongful taking or exercising of control over property of a disabled adult with intent to defraud him of it." SDCL 22–46–1(3). We hold that Warren's acquisition of funds belonging to Hess, in the counts alleged, constituted a violation of the statute.

With respect to the $1,000 Christmas gift, Warren was able to obtain this amount while Hess was in the Ft. Meade hospital in ICU for a life-threatening condition. She took advantage of his poor state of health and her trust relationship to acquire the $1,000.

Regarding the $24,000 mortgage check, Warren testified that her mortgage was actually $1,950 less than that amount. She kept the extra money and did not inform Hess of it. Additionally, Hess testified that he just laughed at Warren when she would ask him to pay off her mortgage. Additionally, the testimony of Hess' nephew, Grudum, indicated that Warren told him that she was going to get Hess to pay off her mortgage. She used her position of trust to obtain the money to pay off the mortgage, which he otherwise appeared not willing to pay, in addition to an extra $1,950 above the mortgage.

With respect to the $2,000 rent check obtained on January 28, 1988, Warren testified that this was for February rent. She testified that she was charging additional money for extra care. State's evidence indicated that the extra care pertained to his bedwetting. Consequently, as State points out, Warren was charging prospectively for February bedwetting. Additionally, Grudum testified that she informed him that she charged Hess more than the other tenants because he could afford it. Mrs. Hammer testified that during a conversation with Warren, Warren informed Mrs. Hammer that she was going to get all she could out of Hess because it all went for taxes anyway. Knowing that Hess was not in a sufficiently healthy condition to refuse such charges and unable to look for housing elsewhere, by virtue of her position of trust, she was able to obtain the additional charges.

Hess did not have any relatives in the area to care for him or to consult with on such matters. He had only two living relatives, neither of which even lived in this state. Both parties essentially agree that Hess was disabled and had to rely on someone for his care. The evidence indicated that when Hess went to Denver to have his pacemaker implanted he did not want anyone else but Warren to go with him, thereby exhibiting his trust and reliance on her for certain emotional needs. Hess' testimony at trial concerning a question asked by

the State as to why he would pay her such a large amount for bedwetting he testified, "No other choice. Nothing else I can do," evidencing that Hess had nowhere else to turn. He either had to use a walker or wheelchair to be mobile. As testified to by Mrs. Hammer, Hess was not accustomed to giving people such large gifts. She testified that she recalled monetarily he would give $10 as a gift to a relative or friend on holidays or birthdays. On one occasion he gave a used colored TV as a wedding gift. In addition, Warren concedes that she assisted Hess in actually writing out checks, helping him purchase CD's, taking interest checks to the bank, recording transactions in his ledger, and filling out deposit slips, thereby having some control over the documentation and recording of his finances. Hess was almost totally dependent on Warren for his survival.

In determining the sufficiency of the evidence on appeal, the question is whether there is evidence in the record sufficient to sustain a finding of guilt beyond a reasonable doubt, if believed by the jury. This court accepts that evidence and the most favorable inferences that can be fairly drawn therefrom, which support the verdict. *See State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988). *See also State v. Jenner*, 451 N.W.2d 710 (S.D.1990). We hold that the jury in this case could have found beyond a reasonable doubt that Warren, by virtue of her position of trust, was able to exploit funds accumulated and saved by Hess in violation of the trust instilled in her by Hess.[8]

We have considered the other issues raised by Warren and find them to be lacking in merit.

Affirmed in part and reversed in part.

WUEST, MORGAN and SABERS, JJ., concur.

HENDERSON, J., concurs in part and dissents in part.

---

8. State's evidence indicates that Warren constantly had a minimum balance in her checking account and was overdrawn on several occasions.

HENDERSON, Justice (concurring in part; dissenting in part).

Although I join the majority opinion on issue one (Hess was competent to testify) and issue three (Warren committed exploitation of a disabled adult), I cannot agree on issue two (that the convictions of grand theft by transfer are to be reversed).

To the contrary, I would uphold the jury verdicts of grand theft by transfer for the reason that the jury heard all of the testimony and was convinced that these crimes were committed against this aged, infirmed, and helpless old man and that Judge Tschetter properly submitted the case to the jury on grand theft by transfer. There is absolutely no error of law below which justifies setting aside these convictions. Myria Warren is guilty, under the law, and also under the facts.

There are seven paragraphs, under issue two, before the majority opinion then adds the seventh and eighth paragraphs, the latter exonerating Warren by one, and one only, conclusion which is this: "Although it is clear that Warren received the funds from the checks and became co-owner of the CD, the record is totally devoid of any evidence that she *transferred* anything. In fact, as noted earlier, the jury rejected all of State's claims that she had committed any forgeries." The sentence following this statement is, in essence, a lament by the majority opinion that it cannot hold otherwise. It is upon these last two paragraphs that I take great issue with, believing that the lamenting paragraph is totally irrelevant to a legal discussion and the "leap of logic" paragraph, upon which three convictions are reversed, is faulty in analysis.

We must consider the jury instructions submitted by the trial court in assessing the propriety of the three convictions on grand theft by transfer. In settlement of instructions, it is noted that the trial court inquired of defense counsel if defense counsel had any objection to the instructions which the trial court had prepared.

On page 186 of the trial transcript, volume 5, we find:

Defense counsel: "The instructions in their present form, as indicated by the Court, are not objectionable to the defense."

The court: "Very well, thank you."

And thereupon the trial court read the instructions to the jury. Under past cases, in this Court, these instructions became the law of the case, as no objection was voiced by the defendant. A lawyer must protect the record for his client, i.e., preserve the record, with timely objections. And should file his own proposed instructions as to what he believes is the proper law in the case. He cannot idly sit by during the heat of the battle and then, later on, thump his chest, like an angry warrior, and bay at the moon. The leading case on the aforesaid subject in this Court is *State v. Halverson*, 87 S.D. 110, 203 N.W.2d 421 (1973). The rule is stated as follows: "Where no exceptions or objections were made by the defendant to any instructions of the court, and the defendant proposed no instructions, there is no question concerning the instructions before the Supreme Court on appeal." This rule was reaffirmed in *State v. White Mountain*, 332 N.W.2d 726 (S.D.1983).

The majority decision now eviscerates the law of the case by expressing that the facts of this case, insofar as the three convictions on grand theft are concerned, do not fit within the term "transfer." In my opinion, the terrible things that the defendant did to this aged, defenseless old man, fit squarely within the instructions and squarely within that which the statute forbids. Judge Tschetter's instructions are found below, and they should be approved so that trial judges, in this state, in the future, have a sense of direction on how to instruct juries on this precise issue. Thus, I would approve these instructions and affirm the convictions, not simply because they are the "law of the case" but also because they correctly identify the elements of the crime itself.

Instruction 17 provided:

The essential elements of the offense of theft by transfer of property as charged in Counts IX through XVIII of the Indictment, each of which the State must prove beyond a reasonable doubt, are:

1. That the defendant at the time and place alleged in the indictment transferred moneys to benefit herself;

2. That said money was the property of John Edward Hess;

3. That the defendant transferred said moneys with intent to benefit herself without being entitled thereto, and

4. That the property had a value exceeding two hundred dollars.

Instruction 18 provided:

In a crime such as that of which the defendant is charged in counts IX through XVIII of the indictment, there must exist a union or joint operation of act or conduct and a certain specific intent.

In the crime of Grand Theft by Transfer there must exist in the mind of the perpetrator the specific intent to unlawfully deprive John Edward Hess of his property and unless such intent so exists that crime is not committed.

Let us now consider the evidence from a proper role as reviewers of the evidence in this case. Our scope of review is long established.

... when reviewing the sufficiency of the evidence *our review requires that we accept the evidence and the inferences that the jury may have drawn therefrom in support of the verdict.* The jury's verdict will not be set aside if the evidence and the reasonable inferences therefrom sustain a rational theory of guilt." (emphasis supplied mine).

*State v. Bachman*, 446 N.W.2d 271, 272, 273 (S.D.1989).

Clearly, as we apply the facts to the instructions of the trial court and consider our long-standing review, as set forth in *Bachman*, this Court should not set aside these guilty verdicts.

Consider these two instructions, given by the trial court, also, namely instructions 14 and 15. Instruction 14 simply sets forth, to the jury, the phraseology of SDCL 22–30A–2 which provides:

Any person who transfers property of another or any interest therein, with intent to benefit himself or another not entitled thereto, is guilty of theft.

Instruction 15, which is the pivotal point of law in this appeal, provides:

The term transfer, as used in these instructions means to convey or shift from one person or place to another or to make over the possession of legal title to another.

And "transfer," under this definition, is exactly what Myria Warren did and for which she now stands convicted at the Bar of Justice.

There are no objections to these instructions by defense counsel. They are "law of the case" also. And these instructions are proper statements of the law and should be used by the trial judges of this state in the future.

### Conviction on Count X of the Indictment

This arises out of Myria Warren swindling (thieving) Edward Hess out of $1,300 in rent money. She charged him rent of $700 on April 1, 1986. This was the "set amount of rent." On April 16, her checking account reflected a balance of $5.83. She needed money. So she went to the aged, infirm man and obtained a check for $1,300 on April 16, 1986. She was not entitled to this extra $1,300 rent, and the evidence so established, and the jury so found. Myria Warren testified that she charged this extra $1,300 because of his illness. But the jury did not believe her! Rather, they believed she was guilty of swindling Mr. Hess out of $1,300 by having caused him to "convey" or to "shift from one person or place to another" or to "make over the possession of legal title to another." She cheated him: *she had him transfer money unto her* that she was not entitled to; her account reflected an overdraw of $1,184.60 on April 1, 1986; plainly, she was short of money and she took advantage of Mr. Hess, the victim of her inferential, if not outright, theft. The jury drew inferences from the evidence, displaying its common sense, and that is why the holding in *Bachman* is right on point as we apply (or should apply) our scope of review in this factual situation.

### Conviction on Count XI of the Indictment

This arises out of Myria Warren attempting to swindle and cheat and thieve any future heir out of a $20,000 CD in the name of Mr. Hess by simply having her name placed thereon as a joint tenant. She accomplished this because of the age and infirmity of this elderly man. Then to seal her transfer of this property, once the joint tenancy had been accomplished, she had Edward Hess place his initials, "E H" on the reverse side of the CD, or did it herself. This, in commercial law, then made it possible for her to cash the CD. When she was asked to return the CD, she refused, exercising a dominion over it. Common sense tells us that Myria Warren (A) did not own this CD and (B) she manipulated the CD into a position whereby she could cash the CD and thus, under instruction 15, "shift from one person to another," i.e., transfer. Powerful testimony on this count came from June Grosse, a bank employee. She testified that she, indeed, changed CD # 54180 on April 23, 1986, from Hess to "Edward Hess or Myria Warren," as joint tenants. She further testified that she did not recall seeing Hess at all, when the CD was changed. She further testified that she did not see Hess sign his name or implant his initials on the CD. Furthermore, Mr. Hess himself testified that he did not sign the CD over to her and did not place his initials on the reverse side of the CD. The jury had a duty and right to consider this testimony. That it did. And it arrived at the conclusion that Myria Warren tried to "benefit herself." Certainly the jury must have been swayed by testimony that Hess' attorney demanded a return of the CD, and that Myria Warren refused to turn it over to said attorney. If she did not intend to "benefit herself," she would have returned the CD promptly. Unquestionably, she was exercising dominion and control over this CD. It was not her CD, yet she transferred its status by having her name placed thereon as a joint

tenant. Again, as we look at the statute, it is perfectly clear that she "shifted it from one person to another." And she had thereby, also, had an instrument "made over," i.e., the possession of legal title to another. It is wrong to reverse this conviction on the $20,000 CD.

### Conviction on Count XII of the Indictment

This count pertains to the jury's determination that Myria Warren obtained $2,000 from Edward Hess on May 1, 1986, and constituted a theft by transfer. The facts are that, on this date, a $2,000 check was written and one Dr. Zeldes, an expert, a forensic administrator, testified that, in his opinion, the signature of Edward Hess which appeared on the check was not written by Edward Hess. Hess denied, under oath, that he signed it. He testified that the check was too big. To understand Hess' viewpoint, he earlier testified that Myria Warren started out charging him $400 a month to permit him to live in her home. He was asked if his rent was ever increased and he told the jury "whatever she could get." This $2,000 check was written when Edward Hess was seriously ill. He did not receive the $2,000. Myria Warren cashed the check and she got the money. It was an unfair amount of rent; not only was it unfair, it was an outrageous amount. It was a transfer. Testimony revealed that, at this time, she was handling his business affairs such as writing out checks for him, handling his money, and making out deposits for him. Forgery has different elements than the crime Myria Warren stands charged and convicted of in this specific count of the indictment, namely Grand Theft by Transfer. It is totally ungermane to rely upon rationale, such as the majority opinion on its discussion of reversing this count that "In fact, as noted earlier, the jury rejected all of State's claims that she had committed any forgeries." The jury had every right to determine that even if she did not sign Mr. Hess' name, that she had been writing checks for him, and that if she caused Hess to write his name, and when he was quite ill, that she had no right to obtain a large

amount of money, like $2,000, and then claim it as a reasonable amount of rent. Myria Warren testified, under oath, that Hess trusted her while he lived in her home. It is obvious that the jury concluded that she abused this trust and caused to be transferred, over unto herself, the sum of $2,000 which did not belong to her. Is it not true that the jury determines the facts? Myria Warren testified that she charged the said $2,000 as and for rent. She testified that this tremendous increase was due to the additional care Mr. Hess needed. The State dug up the evidence that, just the day before she obtained the said $2,000, Myria Warren's checking account was overdrawn $2.90. This evidence was admitted and heard by the jury. So why did she obtain the $2,000? Easy answer. She needed it. And she had this old man's checkbook under her control. Indeed, she caused to have transferred unto herself $2,000 which did not belong to her, it simply being the property of another, and with an intent to benefit herself, thereby fitting herself within the forbidden conduct of SDCL 22-30A-2.

Transfer. A word. What does it mean? Myria Warren now argues what it means in her appellate brief. There are three pages of argument on its meaning in Myria Warren's brief. I say: It's too late! Counsel is trying to come in the back door, arguing the definition of "transfer" when he failed to do so in the lower court. Judge Tschetter told the jury what it meant. There were no objections. The jury relied on these instructions, including the meaning of "transfer." A sum of $2,000 was "shifted over" and "from one person to another," exactly as set forth in the statute. Judge Tschetter's instructions were proper; we should use them as precedent in the future.

Statutory construction is a rather vague expression. Quite generic in form, it can boil down to many interpretations, from one scholar of the law to the other, all well meaning in their interpretation of what the statute means. Great masters of the law such as Justice Holmes, Justice Brandeis, Learned Hand, and Benjamin Cardozo, all had different styles of literary persuasion

when called upon to elucidate on the totality of the meaning as it concerned the enactment before them. These styles stem from different approaches, ideas, and thoughts on statutory construction. Unquestionably, before us, does there stand a question of the interpretation of a statute. I can hardly pit myself against the great masters. However, I am constrained to say that the first step in construing a statute requires a recognition and implementation of its underlying purpose. I ask myself: What were the mischiefs intended to be remedied by this statute? Secondly, I further ask myself: What good was the Legislature trying to achieve for the people? Thirdly, I ask myself: How can I apply this statute using words in their ordinary signification so that they do not produce an absurdity?

Before us, the majority seems to take a very restricted, literal approach as to what constitutes "transfer." I simply cannot join it. I believe the majority uses a strained subtlety, by employing the "forgery" argument, to inadvertently miss the purpose—the mischief—for which this statute was passed by our State Legislature. Doubt and darkness alight upon the Grand Theft by Transfer statute in our state, as a result of the majority opinion. Unfortunately, we have not lit a candle for judges in the future. It appears that the statute has been misinterpreted by the majority opinion because the jury did not find that Myria Warren committed forgery. I call your attention, under the general title of CRIMES, to SDCL 22-1-1:

> The rule of the common law that *penal statutes are to be strictly construed has no application to this title.* All its

criminal and penal provisions and all penal statutes are to be construed according to the fair import of their terms, with a view to effect their objects and promote justice. (emphasis supplied mine).

I seriously doubt that there is inadequate statutory draftmanship before us. It appears to me that this Court has placed a rather sharp rephrasing as to the meaning of the statute, eradicating the mischief which it seeks to condemn, and thus does limit its practical effect. Penal statutes are not to be strictly construed, but rather by the fair import of their terms. We have said so in several cases. *State ex rel. Strauser v. Jameson,* 76 S.D. 490, 81 N.W.2d 304 (1957); *Bartron v. Codington County,* 68 S.D. 309, 2 N.W.2d 337, 140 A.L.R. 550 (1942); *State v. Whitmarsh,* 26 S.D. 426, 128 N.W. 580 (1910). The Grand Theft by Transfer statute was passed to make certain acts criminal which offend our society, acts which we see before us committed by Myria Warren. Instruction 15 defines "transfer," which I have set forth above. Three of her felony convictions are being reversed due to that word "transfer." The literal force of the majority's rigidity in statutory construction has eschewed the words of the State Legislature, and thus, denied the will of the sovereign.

Thus, I respectfully dissent to the reversing of the three convictions aforesaid.