#29308-a-PJD
**2022 S.D. 16**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

| | |
|---|---|
| JAMES BRUGGEMAN, | Petitioner and Appellee, |
| by BLACK HILLS ADVOCATE, LLC, | Substitute Petitioner and Appellee, |
| v. | |
| JENNIFER RAMOS, | Respondent and Appellant. |

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHELLE K. COMER
Judge

\* \* \* \*

| | |
|---|---|
| CASSIDY M. STALLEY<br>N. DREW SKJOLDAL of<br>Lynn, Jackson, Shultz,<br>  & Lebrun, P.C.<br>Rapid City, South Dakota | Attorneys for petitioner and appellee. |
| | |
| STEPHEN J. WESOLICK of<br>Aspen Legacy Planning/Wesolick<br>  Law Firm<br>Rapid City, South Dakota | |
| | |
| MARIAH C. BLOOM<br>Rapid City, South Dakota | Attorneys for respondent and appellant. |

\* \* \* \*

ARGUED
APRIL 27, 2021
OPINION FILED **03/23/22**

#29308

DEVANEY, Justice

[¶1.] Black Hills Advocate, as James Bruggeman's guardian and conservator, petitioned for a protection order against Jennifer Ramos alleging Bruggeman is a vulnerable adult and was subject to vulnerable adult abuse by Ramos. After a hearing on the petition, the circuit court determined that Bruggeman is a vulnerable adult and found by a preponderance of the evidence that Ramos neglected and financially exploited Bruggeman while she was his caretaker and was entrusted with his property. Ramos appeals, asserting multiple issues. We affirm.

## Factual and Procedural Background

[¶2.] Bruggeman and Ramos have known each other since Ramos was nine or ten years old. Ramos testified that she first met Bruggeman when he was trying to help her mother become sober. She also testified that when she was approximately twelve years old, Bruggeman became her temporary guardian because her mother was incarcerated. Ramos considered Bruggeman to be like family to her; however, there was a period of time when she did not have regular contact with him. According to Ramos, Bruggeman had raped her when she was approximately fourteen years old, and in 2002, she obtained a protection order against him. Nevertheless, Ramos further testified that she "never really stopped talking to him" and ultimately forgave him. The two remained close, and she considered him to be the only stable person in her life. He drove her to school, made meals for her, taught her how to drive, purchased vehicles for her, helped her get sober, and cared for her as a father would care for a daughter.

-1-

[¶3.] In 2011, when Bruggeman was 66 years old, he was diagnosed with vascular dementia after going to the Veteran's Administration (VA) emergency department reporting confusion and disorientation. The VA note from the visit indicated that Bruggeman previously had a stroke and a coronary artery bypass. In 2011, he was living on his own, but his close friends, including Ramos, were helping him with administering medication, paying bills, preparing meals, shopping, etc. Bruggeman, a veteran, was recommended for a dementia clinic referral and a referral for home health services. By January 2012, Ramos took over as Bruggeman's primary caregiver.

[¶4.] In June 2012, Bruggeman appointed Ramos to be his attorney-in-fact upon his disability or incapacity under a power of attorney. In the same document, Bruggeman designated Ramos as his agent to make healthcare decisions for him if he became unable to speak for himself. Also in 2012, Bruggeman executed a new will naming Ramos as personal representative and leaving his entire estate to her. Bruggeman was not married and did not have any children of his own. Ramos testified that she did not know of the various appointments or the will until around 2013.

[¶5.] In October 2012, Bruggeman purchased a residential property (Union Street property) for Ramos and her children. Ramos was married at the time but claimed that she was getting a divorce and that Bruggeman wanted her and her children to have a place to live. She also asserted that although only Bruggeman's name was on the mortgage and deed, she paid the mortgage on the property. When asked from which account she made the mortgage payments, Ramos testified that

the mortgage payments were automatically withdrawn from Bruggeman's account, but she claimed that she transferred her own money to his account for the mortgage payments. She further testified that she believed Bruggeman's bank account was hers as well because Bruggeman had put her name on this bank account and allowed her to spend money from the account for her needs. The bank records entered into evidence at the hearing by Black Hills Advocate do not reflect that transfers were made from an account owned by Ramos to cover the mortgage payments, and Ramos did not offer any bank records of her own.

[¶6.] In May 2014, the VA recommended to Ramos that Bruggeman receive a higher level of care because he had fallen, he had consistently forgotten to take his medications, and he was struggling to bathe himself. In response, Ramos decided to convert a small garage at the Union Street property into an apartment for Bruggeman. Ramos testified that she chose this option rather than move him into an assisted living center because Bruggeman wanted to continue to live independently. She explained that while Bruggeman lived in that apartment, she took care of everything for him—she helped him shower, made all his meals, paid his bills, and administered his medications. She also testified that she had placed a baby monitor in the apartment to hear if Bruggeman needed assistance.

[¶7.] To assist the VA in delivering medical care to Bruggeman, the VA had him undergo a cognitive evaluation. In January 2015, Dr. Michael Huxford met with Bruggeman and Ramos. As a result of his evaluation, Dr. Huxford opined that Bruggeman suffered from an "impairment in cognitive functioning, specifically in areas of attention and working memory." In February 2015, the VA assessed his

new living arrangement. The VA note documenting the visit related that there had been previous discussions with Ramos about a lack of follow-through from her on matters related to Bruggeman's care. The note also documented that during the meeting, Ramos expressed a commitment to caring for him, and the VA decided to continue to provide home health support.

[¶8.] In July 2015, Dr. Huxford performed a neuropsychology examination on Bruggeman. He observed that Bruggeman's current level of cognitive functioning was consistent with his neuropsychological results from his 2013 evaluation, but also observed a noticeable decline in his story recall. Dr. Huxford opined that consistent with the 2013 evaluation, Bruggeman demonstrated impaired cognitive functioning, specifically in the areas of attention and working memory. Dr. Huxford diagnosed him with mild vascular neurocognitive disorder.

[¶9.] In December 2016, Bruggeman underwent additional neurocognitive testing. The note following the examination indicated that the consultation was requested by his primary care provider because of potential worsening cognition and increased behavioral difficulties. The note also mentioned that his caregiver indicated that Bruggeman had been "financially exploited by a silver/gold collector" in excess of $10,000. Dr. Huxford noted that his examination of Bruggeman indicated that his cognitive abilities seemed to be worsening. Dr. Huxford diagnosed him with major neurocognitive disorder due to vascular etiology with behavioral disturbance. He also determined that because of Bruggeman's impaired abilities, recent poor financial judgment, disorientation and confusion, and increased impulsivity and inhibition, it was "clear that his capacities to function on

some independent level are not possible." Dr. Huxford recommended that he be referred to neurology rehabilitation services and that he remain "physically and mentally active and engage in social activities . . . shown to preserve and promote cognitive health . . . under the consultation of his primary health provider and supervision of his primary caregiver."

[¶10.] Dr. Huxford discussed his findings with Ramos, and in April 2017, a VA social worker strongly recommended to Ramos that Bruggeman receive 24-hour care and supervision. The VA note documenting the social worker's recommendation noted a concern about Ramos's ability to manage his needs given her work and other family obligations. Further, although Ramos had the power to make health care decisions for Bruggeman, the VA social worker noted that "there is a relationship dynamic between the two of them that impairs her ability to make the best decision for [his] care." The VA note documenting the recommendation also noted that although 24-hour care and supervision had "not been [his] wish," the social worker was concerned "about [his] capacity to make that decision." The social worker told Ramos that his living situation was "not ideal" and the VA might "not continue to provide services as it enables him to remain in less than desirable conditions." The note further documented that Ramos declined additional support services (e.g., home bath aide, homemaking care, and Meals on Wheels) despite Bruggeman's agreement to use the services. According to the VA note, Ramos agreed to attend a meeting to discuss living arrangement options.

[¶11.] In May 2017, Ramos informed the VA that she did not intend to follow through with its placement recommendation of nursing home care. According to the

VA's notes, Ramos stated that to do so would have a negative financial impact on her and her children. She told the VA that she and Bruggeman had commingled their assets and that his name was on her home loan and title. She claimed that placing him in long-term care would mean she would lose the house and the vehicles. In light of Ramos's statements, the VA became concerned about possible financial exploitation and contacted the South Dakota Department of Human Services (the Department). The record does not contain additional information about whether the Department conducted an investigation in response to the report. In June 2017, the VA discharged Bruggeman from home health services and directed Ramos to re-establish his medical care with a primary provider.

[¶12.]     In January 2018, the VA contacted the Department again with concerns that there had been no medical follow-up since Bruggeman's discharge from the VA's home health services and he had not shown up for a scheduled appointment. The VA expressed further concerns about whether Bruggeman had the capacity to manage his own health care decisions and with his reliance on Ramos for assistance in making and attending appointments. The VA informed the Department that he might not be receiving the medical care he needed because he had not yet re-established primary care after being discharged from the VA's home-based primary care services. The record does not contain information related to what investigation, if any, the Department took in response to this report.

[¶13.]     In March or April 2018, Ramos contacted Wells Fargo to be added as a supplemental account owner/authorized third party on Bruggeman's Wells Fargo investment accounts. She claimed that she did so because she and Bruggeman had

believed, incorrectly, that she already had full access to these accounts but then learned otherwise from the bank. Bruggeman's long-time financial advisor, Troy Niehaus, testified that given "the seriousness of giving someone third-party authorization," he asked Bruggeman to come to the bank. Both Bruggeman and Ramos attended the in-person meeting in April 2018. Niehaus testified that Bruggeman indicated he wanted to add Ramos as a supplemental account owner in case he became incapacitated and money or securities needed to be moved for his benefit. Ramos agreed with this characterization of the purpose for the requested change. There was also a discussion during this meeting about Bruggeman buying a new house. According to Niehaus, Ramos said that Bruggeman planned to purchase a larger house for him, her, and her children so that they could all live in the main home and he would have more supervision as requested by the VA.

[¶14.] After the necessary paperwork was completed, making Ramos a supplemental account owner, Ramos amended a purchase agreement that she and her husband had executed in March 2018 for the purchase of a new home (Willow Creek property).[1] The amendment removed Ramos's husband as a purchaser and removed a contingency that they obtain a mortgage. The sellers requested proof from the bank that the necessary funds were available for Ramos's use. In

---

1. There is little information in the record about the relationship between Ramos and her husband. It appears her husband never resided with her and the children at the Union Street property. Ramos testified at the protection order hearing that the reason she initially executed the purchase agreement with her husband for the Willow Creek property was because her husband was trying to save their marriage. But then she explained that she decided to forego this plan because their marriage could not be saved. She claimed at the hearing that her husband had filed for divorce, and Ramos called her boyfriend to testify at the hearing.

response, Ramos contacted the VA, requesting that the VA issue a letter opining that Bruggeman does not have decision-making capacity. The VA ordered another neurological evaluation, which was completed on May 9, 2018, by Dr. Jon Dennig.

[¶15.] Dr. Dennig noted the findings from Bruggeman's previous evaluations and similarly concluded that his "judgment and decision making continues to be a major concern because of what it suggests about his ability to manage his health care, finances, and ADLs [activities for daily living]." He opined that Bruggeman "no longer has the capacity to care for himself or make decisions that are in his best interests" and diagnosed him with vascular dementia with behavioral disturbance (impulsivity/inhibition). He recommended a higher level of care, such as a nursing home or assisted living.

[¶16.] On May 14, 2018, Ramos withdrew $228,756.46 from Bruggeman's Wells Fargo investment accounts. A week later, she withdrew $100,000 from his account at Pioneer Bank and Trust. On May 21, 2018, Ramos purchased the Willow Creek property using $296,500 of the money withdrawn from Bruggeman's accounts. She later withdrew an additional $8,000 from his Pioneer Bank and Trust account to construct a pole barn on the new property.

[¶17.] After Ramos withdrew these funds, Bruggeman contacted Niehaus multiple times. According to Niehaus, Bruggeman expressed concern throughout the summer of 2018 about his available balances and requested notification if Ramos attempted additional transactions. He also asked that Ramos be removed as a supplemental owner, but according to Niehaus, Bruggeman would change his mind, so Ramos's authorization was not removed. During one conversation,

Niehaus learned from Bruggeman that he had not moved into the Willow Creek property with Ramos and believed he likely never would. This concerned Niehaus because he was under the impression that the withdrawal of money from Bruggeman's account was for a new home in which Bruggeman would live. He contacted Wells Fargo's Elder Client Initiatives to seek guidance on how to proceed. Thereafter, Wells Fargo restricted Bruggeman's Wells Fargo accounts, and in September 2018, Bruggeman signed a document revoking Ramos as a supplemental owner/authorized third party.

[¶18.] In August 2018, Bruggeman moved into an assisted living center. In January 2019, while he was still residing there, he left the facility against medical advice and Ramos's wishes and went to Arizona with a friend. After later learning of his whereabouts, Ramos brought Bruggeman back to South Dakota in April 2019. Ramos discovered that he had been in a rehabilitation facility in Las Vegas after injuring his back. He was covered in bruises and Ramos brought him to the VA where he was diagnosed with failure to thrive. The VA told Ramos that 24-hour care and supervision was necessary for Bruggeman's safety, but on May 1, Ramos instead had him discharged into her care. She testified that she did so because Bruggeman did not want to be in a nursing home away from Ramos and her children. According to a note kept by the VA, Ramos told staff that he did not have enough money to afford higher levels of care.

[¶19.] Shortly thereafter, on May 14, Ramos brought Bruggeman to the VA emergency department because she was unable to care for him. The VA staff again suspected Ramos was using Bruggeman's money for her own benefit or otherwise

preventing his money from going toward payment for his necessary care and supervision, so they contacted the Department. Becky Fleming from the Department met with Bruggeman on May 21, 2019, and with Ramos on May 30. She informed Ramos that the VA was strongly recommending that he not be discharged into her care. According to Fleming, Ramos was upset with that information and indicated concern over finances. Fleming testified that Ramos said, "Does everyone expect me to sell my house? I won't do that, I have three kids." Bruggeman was then placed in long-term care at the VA.

[¶20.] In June 2019, Black Hills Advocate filed a petition requesting to be appointed as Bruggeman's guardian and conservator.[2] The circuit court granted the petition on January 31, 2020. Thereafter, on February 7, 2020, Black Hills Advocate petitioned for a protection order alleging that Bruggeman is a person 65 years or older who is unable to protect himself from acts of vulnerable adult abuse by Ramos. In its petition, Black Hills Advocate alleged, among other things, that despite being directed by the court to turn over rental proceeds from two of Bruggeman's properties, Ramos was still collecting and retaining these rental proceeds. The circuit court entered a temporary protection order on February 11, 2020, and noticed the matter for a hearing on February 24, 2020. Prior to the hearing, Ramos filed a motion to amend the protection order to remove the requirement that she be excluded from the Willow Creek property, claiming that the property is her only home. She also indicated that she "will request a future

---

2. In discussions with the circuit court during the hearings in the case at hand, counsel also referred to a prior protection order proceeding that had been commenced but dismissed during this same timeframe.

evidentiary hearing at the February 24, 2020, hearing so that she may have time to subpoena witnesses to come testify."

[¶21.] At the February 24 hearing, the court granted Ramos's motion to amend the protection order. Thereafter, counsel for Ramos asked for a continuance to afford more time for an evidentiary hearing and to better prepare and "to subpoena at least two very important witnesses[.]" She identified the police chief and another, but not Bruggeman, as the "witnesses that we need to have here." Black Hills Advocate objected to the continuance, noting that Ramos's counsel had appeared in the guardianship proceeding involving the same facts and has had the documents Black Hills Advocate intended to present at the protection order hearing since October or November of 2019. The circuit court granted Ramos's motion to continue, and after inquiring of both counsel how much time was needed for a hearing, counsel agreed that a one-day hearing would be sufficient. They also agreed upon a continued hearing date of March 17, 2020.

[¶22.] On March 11, Ramos subpoenaed Bruggeman to appear and testify, and in response, Black Hills Advocate filed a motion to quash the subpoena. Black Hills Advocate attached the following supporting documents to the motion: a VA progress note from May 1, 2018, relating that Ramos had called requesting a letter from the VA that Bruggeman does not have the capacity to make decisions; a report from Dr. Dennig's May 9, 2018 neuropsychological evaluation of Brueggemann; and a May 17, 2019 evaluation report submitted as an exhibit in the guardianship proceeding. Relying on these exhibits, Black Hills Advocate alleged that Bruggeman is not competent to testify, that his attendance at the hearing would be

detrimental to his health, care, or safety because he lacks the capacity to understand, and that confrontation with Ramos would be traumatic for him.

[¶23.] At the beginning of the permanent protection order hearing on March 17, the circuit court granted the motion to quash, relying on its previous determination in the guardianship proceeding that Bruggeman was not competent and further relying on written reports from physicians at the VA that Bruggeman lacked "the capacity to understand" and had severe neurocognitive impairment. The court also determined that it would be detrimental to his health, care, or safety to attend the hearing.

[¶24.] During the hearing on the protection order, multiple witnesses testified including Ramos, Niehaus, and Fleming. At the conclusion of the hearing, the circuit court issued an oral ruling determining that Bruggeman is a vulnerable adult and that he has been the subject of vulnerable adult abuse because of neglect and financial exploitation by Ramos. On April 6, 2020, the circuit court issued written findings and conclusions and a judgment restraining Ramos from contact with Bruggeman and from committing acts of vulnerable adult abuse. The court also restrained Ramos from exercising any powers on behalf of Bruggeman or having control over his funds, property, resources, belongings, or assets. The court ordered Ramos to return custody or control over these items to Black Hills Advocate. The court initially ordered Ramos to convey the Willow Creek property to Bruggeman by warranty deed; however, the court later amended its judgment to remove this directive. Instead, the court ordered Ramos to return $296,500 to Bruggeman, "representing the amount that [she] admits she withdrew from [his]

bank account(s) to purchase the Willow Creek Property." Lastly, the court ordered

Ramos to pay Black Hills Advocate's attorney fees.

[¶25.] Ramos appeals, asserting the following issues:

1. Whether the circuit court abused its discretion when it quashed the subpoena for Bruggeman to testify.

2. Whether the circuit court erred when it determined Bruggeman to be a vulnerable adult.

3. Whether the circuit court erred when it found that Bruggeman was the victim of financial exploitation.

4. Whether the circuit court erred when it found that Bruggeman was the victim of neglect.

5. Whether the circuit court erred when it ordered Ramos to pay Black Hills Advocate's attorney fees.

## Analysis and Decision

### *1. Whether the circuit court abused its discretion when it quashed the subpoena for Bruggeman to testify.*

[¶26.] Ramos first asserts that the circuit court erred in relying on written

neurological evaluations without holding a hearing to assess Bruggeman's

competency to testify. In her view, the medical records were insufficient to support

a finding that he was not competent to testify at this hearing because none of the

records address whether he lacked the understanding to receive, remember, and

communicate impressions, or whether he was able to understand the obligation of

the oath. Ramos further contends that the court erred in relying on its previous

determination in the guardianship proceeding—that Bruggeman's incapacity

prevented his attendance at that hearing—to find him not competent to testify at

the protection order hearing. Ramos asserts that the issue of whether he "needed to

-13-

attend the guardianship proceeding is significantly different than a determination by a physician of whether he can attend a hearing to testify, with sufficient knowledge, understanding, or ability to tell the truth."

[¶27.]    In response, Black Hills Advocate claims that Ramos waived the right to assert this alleged error on appeal.  It notes that Ramos did not ask that the circuit court hold a competency hearing and did not object to the court's reliance on written documents related to Bruggeman's competency that were attached to Black Hills Advocate's motion to quash.  Black Hills Advocate also claims that the court did not abuse its discretion in quashing the subpoena because, according to Black Hills Advocate, Ramos did not specifically dispute Bruggeman's lack of competency to testify.

[¶28.]    Ramos did not file a reply brief on appeal; thus, there is no response from Ramos on the question whether she waived any particular argument. Nevertheless, Bruggeman was presumed competent to testify, *see* SDCL 19-19-601, and Black Hills Advocate, as the party moving to quash the subpoena, had the burden of proving that he was not competent, *see Kern v. Progressive N. Ins. Co.*, 2016 S.D. 52, ¶ 29, 883 N.W.2d 511, 518 (noting that the party moving to quash a subpoena has the burden of proving the necessity of doing so).

[¶29.]    As acknowledged in its brief in support of its motion to quash, Black Hills Advocate was required to prove that Bruggeman lacked "sufficient understanding to receive, remember, narrate impressions and [be] sensible to the obligation of an oath."  *See State v. Warren*, 462 N.W.2d 195, 198 (S.D. 1990); *see also* SDCL 19-19-603 (requiring a witness to give an oath to testify truthfully).  In

support of its motion to quash, Black Hills Advocate offered reports from Bruggeman's health care providers who had recently evaluated his cognitive abilities and asserted that Bruggeman's lack of capacity to testify was akin to that of the individual in *State v. Lufkins*, 381 N.W.2d 263, 266 (S.D. 1986). In particular, Black Hills Advocate noted that the individual in *Lufkins*, like Bruggeman, had difficulty maintaining attention, exhibited unclear memory, had an inability to recall in detail, and had a loss in intellectual functioning. *See id.* at 266.

[¶30.] In response to the motion to quash, Ramos's counsel did not take issue with the findings in the medical reports offered by Black Hills Advocate or object to the court's reliance on these reports in determining whether Bruggeman was competent to testify. Notably, Ramos's counsel in the protection order proceeding had also represented Ramos in the guardianship proceeding, and during the protection order hearing, Ramos's counsel acknowledged the circuit court's prior finding in the guardianship proceedings that Bruggeman was not competent. Counsel also noted the current concern with the potential impact of the coronavirus (commonly referred to as COVID-19) precluding physical contact with nursing home residents like Bruggeman. Counsel nevertheless requested that the court allow Bruggeman to provide "very limited" testimony regarding his wishes with respect to Ramos and suggested that Bruggeman could testify via telephone.[3]

---

3. Counsel advised the court that she had done administrative hearings where persons could appear from the VA "by television" but it is not clear from the record whether or what sort of interactive remote appearance could have been arranged.

[¶31.]    In its oral ruling on the motion to quash, the circuit court explained that it was relying on an evaluation report from the guardianship proceeding, also attached as an exhibit to Black Hills Advocate's motion to quash, in which the doctor who had assessed Bruggeman from May 24 to August 19, 2019, opined that his attendance at the guardianship hearing would be detrimental to his health, care, or safety because he lacked the capacity to understand. The court also indicated that it was relying on the 2018 written neurological report and the 2019 competency evaluation submitted by Black Hills Advocate. These reports contain the same determination—that Bruggeman lacked the capacity to understand because he suffered from severe neurocognitive impairment.

[¶32.]    In the most recent of these prior reports, Dr. Dennig indicated that he had assessed Bruggeman's "[e]xecutive functioning, spatial abilities, memory, attention and language[.]" According to Dr. Dennig, since 2017, Bruggeman has had "considerable degradation in executive functioning along with the ability to pay attention and concentrate." He further opined that:

> [Bruggeman] is easily confused about the task in front of him, and was disoriented to time. His expressive verbal skills far outperform his receptive abilities. . . . His performance today is a major concern in terms of his mental capacities in relation to his peers.

In regard to specific testing observations, Dr. Dennig reported that Bruggeman's comprehension of instructions was poor. Of most concern for Dr. Dennig, was Bruggeman's "inability to pay attention and concentrate." The data from his neuropsychological assessment indicated "a severe impairment in cognitive functioning." Among several recommendations, Dr. Dennig suggested that

Bruggeman receive assistance from a speech therapist because his "receptive language (comprehension) is moderately to severely impaired."

[¶33.] Ultimately, the circuit court granted the motion to quash. It noted "that [it] had previously found [Bruggeman] incompetent" in the guardianship proceeding, and then ruled that it has "now" "found him incompetent." The court also determined that Bruggeman was not competent to testify because he "lacks the capacity to understand." Finally, the court determined that it would be detrimental to his health, care, or safety to attend the hearing.

[¶34.] We review a circuit court's determination as to whether a witness is competent to testify for an abuse of discretion. *See State v. Spaniol*, 2017 S.D. 20, ¶ 12, 895 N.W.2d 329, 335. We also review a circuit court's decision to quash a subpoena for an abuse of discretion. *Kern*, 2016 S.D. 52, ¶ 29, 883 N.W.2d at 517–18. An abuse of discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Field v. Field*, 2020 S.D. 51, ¶ 15, 949 N.W.2d 221, 224 (citation omitted).

[¶35.] Ramos and the dissent correctly identify that a circuit court's determination of incapacity in a guardianship proceeding is not the same as a determination that a person is not competent to testify as a witness. In a guardianship proceeding, the court is tasked with determining whether a person "is impaired to such an extent" that he or she "lacks the capacity" to manage "health, care, safety, habilitation, or therapeutic needs" or "the capacity to manage property or financial affairs" without assistance. SDCL 29A-5-302, -303.

[¶36.]     However, the circuit court did not simply rely on its previous

competency determination in the guardianship proceeding.[4]  Rather, the court

relied on the medical evidence submitted by Black Hills Advocate and determined

that it was finding Bruggeman not competent to testify because the evidence

currently before the court established that Bruggeman lacked the capacity to

understand.[5]  The court also, contrary to the dissent's view, applied the correct legal

standard.  In particular, the court noted that its current ruling was based on this

Court's decision in *Lufkins*, a case wherein we upheld the circuit court's

determination that a witness was not competent to testify because he "*lacked the*

*understanding* to receive, remember, and narrate any remaining impressions."[6]  *See*

381 N.W.2d at 266 (emphasis added).

---

4.     The dissent focuses much of its determination that the circuit court erred on Black Hills Advocate's statement that the circuit court had previously found Bruggeman incompetent.  *See supra* Dissent ¶¶ 77–78.  Such an isolated reliance on this statement ignores that Black Hills Advocate argued in its motion to quash that "like the individual in *Lufkins*, Bruggeman has been evaluated by professionals, each finding that Bruggeman does not have the capacity to testify."  As support for this contention, Black Hills Advocate attached the medical records the court then relied on in quashing the subpoena.

5.     The dissent suggests that Black Hills Advocate was required to present live expert testimony to support that Bruggeman was not competent to testify.  *See id.* ¶ 76.  However, the dissent cites no authority to support that live expert testimony, as opposed to written expert reports, is *required*, particularly when there is no objection to such reports.  Here, the circuit court had before it documented expert opinions, unchallenged by Ramos, related to Bruggeman's mental status.

6.     The circuit court also cited SDCL 21-65-7 as a legal basis for granting the motion to quash.  That statute provides in part that "[t]he court shall exercise its discretion in a manner that protects the vulnerable adult from traumatic confrontation with the respondent."  *Id.*  However, because the circuit court

(continued . . .)

[¶37.]        Nevertheless, the dissent further faults the circuit court for not "personally interact[ing] with Bruggeman" when assessing his competency to testify.  The dissent then quotes *State v. Lutheran*, for the proposition that the circuit court should have personally examined Bruggeman.  *See* 76 S.D. 561, 82 N.W.2d 507 (1957) (examining whether a nine-year-old rape victim was properly found competent to testify).  While this Court noted, in *Lutheran*, that the circuit court did not err in finding the child to be competent "[a]fter informing itself by proper examination and observation," *see id.* at 564, 82 N.W.2d at 509, we did not hold that a circuit court *must* in all instances personally observe and canvass a potential witness in order to make a competency determination.

[¶38.]        Admittedly, a court's personal observations of a potential witness could be a significant factor in determining the witness's competency to testify, and in most cases, it is preferable to personally observe and inquire into a prospective witness's competency or conduct an evidentiary hearing to hear expert testimony, or both.  This case, however, unfolded in such a manner that the circuit court's reliance solely on written reports of the observations and conclusions of Bruggeman's medical providers, though perhaps atypical, was within the range of permissible choices presented by this unique record.  By the time of the March 2020 protection order hearing, the same parties, counsel, and judge had been litigating similar issues involving Bruggeman and his property for several months, in both a

_____

(. . . continued)
        did not issue any finding that Bruggeman needed protection from a traumatic confrontation with Ramos, we do not examine this particular basis for quashing the subpoena.

separate guardianship and conservatorship proceeding and an earlier protection

order proceeding that had been dismissed. Further, as Ramos's attorney

acknowledged, the fact that Bruggeman was a resident of a nursing home in the

midst of COVID-19 restrictions may well have limited the viable options for an in-

person observation by the court. And critically, Ramos's attorney did not object to

the court's consideration of the unrebutted expert opinions contained in the medical

reports attached to Black Hills Advocate's motion to quash.

[¶39.] Therefore, under the circumstances of this case, the circuit court's

competency determination was not arbitrary or unreasonable. It was based on the

applicable standards and the undisputed medical evidence indicating that

Bruggeman's severe neurocognitive impairment impacted his memory and ability to

comprehend questions as to the past events at issue.[7] Importantly, a finding that a

---

7. The circuit court also quashed the subpoena because it determined that Bruggeman's attendance at the hearing "would be detrimental to his health, care, or safety[.]" In doing so, the court relied on its previous determination in the guardianship proceeding under SDCL 29A-5-306(6) that "the incapacity of the person alleged to need protection will prevent attendance at the hearing" because such attendance "would be detrimental to the person's health, care or safety." Ramos did not dispute that Bruggeman's health is an issue affecting his ability to attend the hearing, and the dissent has not asserted that this is an improper basis for quashing a subpoena. Further, although the dissent suggests that, similar to the circumstances in *Warren*, Bruggeman's testimony could "be received under the special care of the court and under guarded circumstances," *see supra* Dissent ¶ 78, the witness in *Warren* was found competent to testify because his mental deficiencies "were not attributed to [an] inability to receive, remember and narrate" and the witness had "a good remote memory" and "could report facts[,]" *see* 462 N.W.2d at 198. Here, in contrast, the evidence establishes that Bruggeman's severe neurological impairment has impacted his memory, his recall, his comprehension, and thus his ability to receive, remember, and narrate impressions. His difficulties in this regard would likely be heightened if, as the dissent suggests, Bruggeman was compelled to testify remotely.

potential witness lacks *any* of the requisite functions—"understanding to receive, remember, narrate impressions and [be] sensible to the obligation of an oath"— would support a court's determination that the witness is not competent to testify.[8] *See Warren,* 462 N.W.2d at 198. The circuit court did not abuse its discretion in finding Bruggeman incompetent and quashing the subpoena.

[¶40.]     Even if this Court were to conclude that the circuit court should have required Bruggeman's personal appearance in some fashion to assess his competency to testify, that alone would not warrant reversal here. First, Ramos has not contended that the competency determination would have been any different

---

8.     The dissent focuses on Bruggeman's ability to hear, respond to, and communicate with medical staff and then contends that "the medical reports fail to indicate whether Bruggeman had the ability to remember or narrate impressions about the events at issue[.]" *See supra* Dissent ¶ 76 and n.13 (quoting the monthly nursing assessments and progress notes from Bruggeman's time in assisted living). However, these medical reports were not attached to Black Hills Advocate's affidavit in support of its motion to quash. Although these notes were later admitted as evidence at the contested hearing on the merits of the protection order petition, they were not before the circuit court at the time the court granted the motion to quash. Moreover, the language the dissent quotes from these notes in Bruggeman's VA records comes from routine questions asked of all patients regarding their ability to answer questions posed by medical personnel about their immediate condition and physical needs and do not assess whether Bruggeman has sufficient understanding to receive, remember, or narrate impressions as to the past events at issue. In contrast, the more comprehensive neurological reports submitted to the court in support of the motion to quash established that Bruggeman's comprehension is lacking and that he had an inadequate recall ability. As Dr. Dennig opined, "[Bruggeman] is easily confused about the task in front of him, and was disoriented to time. His expressive verbal skills far outperform his receptive abilities."

had the circuit court personally canvassed Bruggeman.[9]  Second, even if we

nevertheless assume, as the dissent has, that the circuit court would have found

Bruggeman competent to testify to the matters at issue, Ramos has not established

that she was prejudiced by the circuit court's decision.  *See City of Onida v. Brandt*,

2021 S.D. 27, ¶ 32, 959 N.W.2d 297, 304 (declining to reverse because circuit court's

error did not harm substantial rights of the appellant).  In fact, Ramos did not

advance a prejudice argument in her brief on appeal or during oral argument.[10]

---

9.    The dissent seems to suggest otherwise and further suggests that the circuit court should have revisited its ruling quashing the subpoena when Bruggeman's additional VA medical records were offered as an exhibit at the commencement of the evidentiary hearing.  *See supra* Dissent ¶ 76 n.13.  The dissent then notes that counsel for Ramos indicated that she was not sure she had seen *all* of these medical records, but this comment was in response to Black Hills Advocate's statement that Ramos's counsel had received "the entirety of the VA medical records" in the guardianship matter.  In any event, Ramos's counsel did not challenge the foundation for admitting the records and did not request a further continuance to examine them.  More importantly, she relied on these same records to support some of her arguments on the merits of the case and never requested that the court revisit its prior ruling on the motion to quash because of information contained in them.

10.   In an attempt to explain how Ramos may have been prejudiced, the dissent advances an argument not made by Ramos that the court's order "effectively granted judgment as a matter of law on the question of whether Bruggeman had the *capacity* to gift the money to Ramos."  *See supra* Dissent ¶ 82.  The dissent's suggestion that the issue before the court in the protection order hearing was whether Bruggeman had the testamentary capacity to make "end of life gifts" to Ramos is flawed in several respects.  There is no evidence in the record supporting the notion that Bruggeman was nearing the end of his life or that he *transferred* or *gifted* the property at issue to Ramos, i.e., proceeds from rental properties and monies contained in Bruggeman's bank accounts which Ramos withdrew to purchase the Willlow Creek property, purportedly so that she could better care for Bruggeman.  The transactions at issue instead involved Ramos having joint access to Bruggeman's assets.  Even in the context of inter vivos gifts, there must be a *transfer* of property made voluntarily and without consideration.  *See* SDCL 43-36-1; *Owen v.*

(continued . . .)

-22-

[¶41.]    Regardless, the evidence Ramos sought to admit via Bruggeman's testimony—"that his intentions have always been to have Ms. Ramos take care of things and that he had given her certain things"—is already in the record. For example, the VA records documented, on more than one occasion, Bruggeman's wish that he continue to be in Ramos's care rather than placed in a nursing home facility. The record also contains evidence establishing that Bruggeman had previously allowed Ramos to use his money to purchase items for her and her children. And finally, the record contains the will Bruggeman executed in 2012 (prior to the medical reports documenting his more recent cognitive decline) leaving all of his property to Ramos and naming her as his personal representative.

[¶42.]    Under SDCL 15-6-61, "no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." The record contains a plethora of evidence upon which Ramos could, and did, assert her

---

(. . . continued)

> *Owen*, 351 N.W.2d 139, 142 (S.D. 1984) (holding that "[t]he fact that a bank account was opened in the names of the *depositor and another* is evidence of the *depositor's intent that either party draw upon the account*, but it is not sufficient to establish a gift inter vivos of the deposit or of any interest in the deposit" (emphasis added)). Even if Bruggeman's *testamentary* capacity was somehow at issue, it is not synonymous with the legal or factual issues before the circuit court when assessing Bruggeman's competency to testify. Testamentary capacity does *not* require "mental capacity to such an extent that according to medical science he is . . . of sound mind and memory[.]" *In re Estate of Dokken*, 2000 S.D. 9, ¶ 14, 604 N.W.2d 487, 491. Competency to testify as to a particular matter, on the other hand, requires a sufficient understanding of the question, the cognitive ability to remember the events in question, and the ability to narrate one's impressions regarding these events. *See Warren*, 462 N.W.2d at 198.

argument that she was acting in accord with Bruggeman's wishes. Thus, even if the circuit court erred in not allowing Bruggeman to testify in some fashion, Ramos has not established that the absence of Bruggeman's testimony harmed her substantial rights.

### 2. *Whether the circuit court erred when it determined Bruggeman to be a vulnerable adult.*

[¶43.] On appeal, Ramos asserts for the first time that SDCL 21-65-1(15) is unconstitutionally vague because it did not give her fair notice that her actions and involvement with Bruggeman were prohibited. SDCL 21-65-1(15) defines "[v]ulnerable adult" as "a person sixty-five years of age or older who is unable to protect himself or herself from abuse as a result of age or a mental or physical condition, or an adult with a disability as defined in § 22-46-1." According to Ramos, "the statute does not provide sufficient guidance about what conduct by others constitutes abuse and, further, how one measures or determines whether an individual is unable to protect himself or herself *as a result* [i.e., as a consequence of] the particular condition."

[¶44.] Ramos did not assert her constitutional challenge below. Ordinarily, one cannot challenge the constitutionality of a statute for the first time on appeal, and here, Ramos has not asserted that an exception to that general rule applies. *See Sharp v. Sharp*, 422 N.W.2d 443, 446 (S.D. 1988) (observing that "a court may in its discretion decide to consider a constitutional issue raised for the first time on appeal because the question is a matter of considerable importance to the public policy of the state"). Accordingly, we will not address Ramos's constitutionality argument.

[¶45.]     Ramos further claims that the circuit court erred because it merely declared that Bruggeman is a vulnerable adult without making any findings as to whether he was unable to protect himself from abuse *as a result* of his mental condition.  She then contends that the evidence does not show that his mental condition prevented him from protecting himself.  In particular, she claims that he is strong willed, and as recently as 2019, he was oriented to person and place and was able to understand others and make his needs known.

[¶46.]     We have not before examined a circuit court's determination that a person is a vulnerable adult as the term is defined by SDCL 21-65-1(15).  The question—whether one is a vulnerable adult under SDCL 21-65-1(15)—is a mixed question of fact and law.  Thus, we review the circuit court's underlying factual findings for clear error and, once the facts are established, review de novo whether the facts support a determination that a person is a vulnerable adult.  *See, e.g.*, *Estate of Henderson v. Estate of Henderson*, 2012 S.D. 80, ¶ 9, 823 N.W.2d 363, 366 (explaining the standard of review on mixed questions of law and fact).

[¶47.]     A review of the record and the circuit court's findings supports the court's conclusion that Bruggeman is unable to protect himself from abuse as a result of his mental condition.  The circuit court found that he was seventy-five years old and suffers from severe neurocognitive impairment.  The court further found that as a result of this mental condition, he requires 24/7 supervision and care and lacks the capacity to make decisions in his best interests.  Quoting Dr. Dennig, the court found that Bruggeman has deficits in "recent poor judgment (financial), disorientation and confusion, and increased impulsivity and inhibition."

[¶48.]     While not noted by the circuit court, Ramos testified that Bruggeman was like a toddler and could not be left alone.  She also agreed that "probably at certain points" it was detrimental to his health to leave him alone.  Further, Dr. Huxford opined that Bruggeman lacked the skills necessary to protect his health or to respond to illness or injury.  Ramos acknowledged that she was aware since 2017 that Bruggeman no longer had the ability to make health care decisions and that he could not take care of himself.  Therefore, the circuit court did not err in determining that Bruggeman is a vulnerable adult under SDCL 21-65-1(15).

### 3.    *Whether the circuit court erred when it found that Bruggeman was the victim of financial exploitation.*

[¶49.]     Ramos contends that Black Hills Advocate failed to prove by a preponderance of the evidence that she financially exploited Bruggeman.  She does not dispute that she was in a position of trust and confidence with Bruggeman.  However, she claims that he has assisted her financially since she was a child, including paying cash to purchase vehicles for Ramos throughout the years.  She further claims he always intended that she have access to his accounts for her and her children's needs.  Thus, she asserts that there is no evidence that she had the requisite intent to defraud Bruggeman.  According to Ramos, "[t]he lifelong familial bond and the attendant, mutual personal and economic support established by the record clearly places this care [sic] outside the parameters of actionable conduct under" SDCL 21-65-1(4)(d) and SDCL 22-46-1(5).

[¶50.]     Under SDCL 21-65-1(4)(d), financial exploitation is listed as a form of vulnerable adult abuse.  SDCL 21-65-1(7) provides that financial exploitation is "exploitation as defined in subdivision 22-46-1(5) when committed by a person who

-26-

stands in a position of trust or confidence[.]" Turning then to SDCL 22-46-1(5), exploitation is defined as: "the wrongful taking or exercising of control over property of an elder or adult with a disability with intent to defraud the elder or adult with a disability[.]" This Court has explained that an "intent to defraud" exists when a person acts "willfully and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self." *State v. Morse*, 2008 S.D. 66, ¶ 12, 753 N.W.2d 915, 919 (quoting *State v. Heftel*, 513 N.W.2d 397, 400 (S.D. 1994)).

[¶51.] We review for clear error the circuit court's finding that Ramos wrongfully took or exercised control over Bruggeman's property with intent to defraud him. *Hiller v. Hiller*, 2018 S.D. 74, ¶ 19, 919 N.W.2d 548, 554 (providing that factual findings are reviewed for clear error). Under the clearly erroneous standard of review, the evidence is viewed in a light most favorable to the court's findings, and "we give due regard to its opportunity to observe the witnesses and the evidence first hand." *Cowan v. Mervin Mewes, Inc.*, 1996 S.D. 40, ¶ 15, 546 N.W.2d 104, 109. "A finding is 'clearly erroneous' when after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake was made." *Russo v. Takata Corp.*, 2009 S.D. 83, ¶ 25, 774 N.W.2d 441, 448 (citation omitted).

[¶52.] The circuit court specifically considered the long-established relationship between Bruggeman and Ramos and the fact that he executed a will leaving his entire estate to Ramos. The court also noted that Bruggeman had purchased items for Ramos throughout her life, including multiple vehicles, and that in 2012, he liquidated assets to purchase the Union Street property for Ramos

and her children. However, on the issue of financial exploitation, the circuit court focused primarily on Ramos's May 2018 withdrawal of approximately $300,000 from Bruggeman's accounts, concluding that she did so with the intent to defraud him by causing financial loss to him and financial gain to herself. The court also observed that throughout 2018, Ramos had been using his money from his bank account, while acting as his power of attorney, to purchase various items for herself and her children.

[¶53.]        In light of our deferential standard of review, we are not left with a definite and firm conviction that a mistake has been made here.[11] It is undisputed that at the time of these recent transactions, Ramos was aware that Bruggeman had been diagnosed with severe neurocognitive impairment and needed 24/7 supervision and care. She was also aware that he had sufficient funds to pay for his placement in a long-term care facility, and she knew she had the responsibility to make financial and health care decisions on his behalf. Yet, she called the VA specifically to request a letter indicating that Bruggeman lacked the capacity to make decisions so that she could then use that letter to personally access his funds. She also brought him to Wells Fargo so he could add her as a supplemental account owner on his investment accounts.

[¶54.]        Instead of using Bruggeman's money to place him in a long-term care facility, Ramos withdrew nearly $300,000 from his accounts to purchase the Willow

---

11.    Were it not for Ramos's more recent conduct in the months preceding the entry of the guardianship and conservatorship, a court could have reached a different outcome given the long-term familial relationship between Ramos and Bruggeman.

Creek property. While Ramos claims the house was for her and her children and Bruggeman to live in together, she only put her name on the deed, and the record suggests he never lived there, or if he did, it was for a very short time. In light of this evidence, the circuit court did not err in determining that "Ramos' actions, as Bruggeman's power of attorney, constitute financial exploitation of a vulnerable adult, with the intent to defraud Bruggeman by financial loss to him and financial gain to herself."

### 4. Whether the circuit court erred when it found that Bruggeman was the victim of neglect.

[¶55.] Ramos asserts that she cannot be found to have neglected Bruggeman because her decision not to place him in a long-term care facility aligned with his express desire not to reside in such a facility. She directs this Court to notations in the medical records wherein Bruggeman related that he wanted to remain independent and claimed that he would not last more than three months if he lived away from Ramos and her children. She also asserts that the circuit court failed to identify instances in which her decision to keep him from residing in a long-term care facility harmed his health or welfare.

[¶56.] Under SDCL 21-65-1(4), neglect is identified as a form of vulnerable adult abuse. This statute incorporates the definition of neglect in SDCL chapter 22-46. Neglect is defined in SDCL 22-46-1(6) as:

> harm to the health or welfare of an elder or an adult with a disability, without reasonable medical justification, caused by a caretaker, within the means available for the elder or adult with a disability, including the failure to provide adequate food, clothing, shelter, or medical care[.]

However, under SDCL 22-46-1.1,

the term, neglect, does not include a decision that is made to not seek medical care for an elder or disabled adult upon the expressed desire of the elder or disabled adult; a decision to not seek medical care for an elder or disabled adult based upon a previously executed declaration, do-not-resuscitate order, or a power of attorney for health care; a decision to not seek medical care for an elder or disabled adult if otherwise authorized by law; or the failure to provide goods and services outside the means available for the elder or disabled adult.

[¶57.] The circuit court did not specifically examine the language of the exception in SDCL 22-46-1.1 to determine whether it applied to the facts of this case. Nevertheless, because we affirm the circuit court's finding that Ramos financially exploited Bruggeman, we need not address whether the court erred in finding an additional form of vulnerable adult abuse or in failing to apply SDCL 22-46-1.1.[12]

### 5. Whether the circuit court erred when it ordered Ramos to pay Black Hills Advocate's attorney fees.

[¶58.] Ramos does not challenge the circuit court's decision to award attorney fees to Black Hills Advocate. She also does not challenge the reasonableness of the fee. Rather, she requests that this Court remand the issue of attorney fees "to the circuit court for more appropriate findings of fact." In response, Black Hills Advocate contends that remand is unnecessary because the circuit court's judgment reflects that the court considered the relevant factors via its findings and

---

12. The propriety of the relief ordered by the circuit court, particularly the provisions unrelated to the financial exploitation, is not currently before this Court because Ramos has not specifically challenged these directives. However, nothing prohibits a party from seeking a modification of the terms of the protection order, and in the event of a modification here, Bruggeman would continue to be protected through the guardianship and conservatorship proceedings.

conclusions incorporating counsel's affidavit addressing the reasonableness and necessity of the attorney fee award.

[¶59.]      Under SDCL 21-65-15, "[t]he court may order that the respondent pay the attorney's fees and court costs of the vulnerable adult and substitute petitioner." "The award of attorney fees 'must be reasonable for the services rendered.'" *Eagle Ridge Ests. Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 28, 827 N.W.2d 859, 867 (citation omitted). While the decision to award fees is discretionary, "[t]here are a number of factors to be considered by a trial court in determining a reasonable award of attorney fees in civil cases[.]" *Id.* The factors, of which none predominate, include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

*Id.* (quoting *In re S.D. Microsoft Antitrust Litig.*, 2005 S.D. 113, ¶ 29, 707 N.W.2d 85, 98–99).

[¶60.]      "This Court has consistently required a trial court to enter findings of fact and conclusions of law when ruling on a request for attorney's fees." *Hoffman v. Olsen*, 2003 S.D. 26, ¶ 10, 658 N.W.2d 790, 793. In particular, courts are to make

specific findings based on the relevant factors. *Duffy v. Seventh Jud. Cir.*, 2004 S.D. 19, ¶ 18, 676 N.W.2d 126, 134. Here, the circuit court took the matter of attorney fees under advisement. It then issued findings of fact, conclusions of law, and a judgment, which included an attorney fee award. Although the court did not enter findings on the factors relevant to such award, the court ordered that "Ramos shall pay [Black Hills Advocate's] reasonable and necessary legal fees incurred in bringing this action as determined by the [c]ourt and *set forth in the Affidavit of Cassidy M. Stalley*[.]" (Emphasis added.) Attorney Stalley's affidavit addressed some of the factors to be considered in determining whether attorney fees are reasonable, including the type and length of litigation, the billing attorneys' experience, the fact that the fee was fixed and was within the range of rates typically charged for similar work, the difficulty of the questions involved, and the time spent and services rendered.

[¶61.] Although the better practice would have been for the circuit court to enter the requisite findings rather than simply adopting counsel's affidavit, remand is not necessary here because the court's judgment, which incorporated counsel's affidavit, provides a sufficient basis from which this Court can review the circuit court's award of attorney fees. *See BAC Home Loans Servicing, LP v. Trancynger*, 2014 S.D. 22, ¶ 23, 847 N.W.2d 137, 143 (noting that the circuit court considered the attorney affidavit in awarding fees); *see also Ridley v. Lawrence Cnty. Comm'n*, 2000 S.D. 143, ¶ 13, 619 N.W.2d 254, 259 (noting that an appellate court, "if it feels that it is in a position to do so[,]" could review an attorney fee award "[d]espite the absence of findings" on whether a lawsuit was frivolously or maliciously brought

such that attorney fees were warranted).  Importantly, Ramos does not challenge the reasonableness of the fee award.  We therefore affirm the circuit court's award of attorney fees.

***Appellate Attorney Fees***

[¶62.]    Black Hills Advocate petitioned this Court for an award of $15,756.68 in appellate attorney fees and taxes.  It filed the requisite affidavit and itemized statement of legal services rendered and asserts that because an award of attorney fees is authorized under SDCL 21-65-15, this Court can award appellate attorney fees pursuant to SDCL 15-26A-87.3.  *See* SDCL 15-26A-87.3 (providing that appellate attorney fees may be granted "where such fees may be allowable").

[¶63.]    In response, Ramos requests this Court deny such an award as unreasonable because Black Hills Advocate was "intimately familiar with the legal issues, pleadings, evidence and issues" from the time it spent in the underlying case before the circuit court.  By way of comparison, counsel for Ramos, who did not try the underlying matter before the circuit court, note that they billed only $6,633.00 to Ramos in conjunction with her appeal.

[¶64.]    While appellate attorney fees are authorized in this case, in our past decisions addressing such fee requests, albeit in domestic protection order and divorce cases, we have "examine[d] the fee request from the perspective of whether the party's appellate arguments carried any merit." *Trumm v. Cleaver*, 2013 S.D. 85, ¶ 16, 841 N.W.2d 22, 26 (quoting *Roth v. Haag*, 2013 S.D. 48, ¶ 21, 834 N.W.2d 337, 342).  Given the unique facts of this case, we do not find that Ramos

"unreasonably required [Black Hills Advocate] to defend against [a] meritless appeal." *See id.* Therefore, we decline to order appellate attorney fees.

[¶65.]        Affirmed.

[¶66.]        SALTER and MYREN, Justices, concur.

[¶67.]        KERN, Justice, concurs in part and dissents in part.

[¶68.]        JENSEN, Chief Justice, dissents.


KERN, Justice (concurring in part and dissenting in part).

[¶69.]        I concur with the majority opinion on all issues aside from the denial of the requested $15,756.68 of appellate attorney fees sought by Black Hills Advocate. Because I would award Black Hills Advocate half of its requested fees ($7,878.34), I respectfully dissent as to this issue alone.

[¶70.]        The majority opinion correctly concludes that an award of appellate attorney fees is authorized in this case pursuant to SDCL 21-65-15 and SDCL 15-26A-87.3. Although we have opined on appellate attorney fees in domestic relation cases concerning divorces, child custody, and domestic protection orders, we have not previously addressed appellate attorney fees in a domestic relation case involving a vulnerable adult and a substitute petitioner, here, Black Hills Advocate.

[¶71.]        In *Trumm v. Cleaver*, a domestic abuse protection order case, we considered whether to award appellate attorney fees "from the perspective of whether the [appellant's] appellate arguments carried any merit." 2013 S.D. 85, ¶ 16, 841 N.W.2d 22, 26 (cleaned up). As part of this review, however, we also considered "the property owned by each party, the relative incomes, the liquidity of the assets and whether either party unreasonably increased the time spent on the

case" in determining whether to award appellate attorney fees. *Id.* (citation omitted). In the underlying case in *Trumm*, the appellee had requested and been granted a domestic abuse protection order against the appellant, and we affirmed the protection order on appeal. We concluded that the appellant had "unreasonably required [the appellee] to defend against his meritless appeal"; for that reason, we awarded the appellee her appellate attorney fees. *Id.*

[¶72.] We conducted a similar analysis to that in *Trumm* in *Roth v. Haag*, an appeal of a custody decision in which both parties submitted motions for appellate attorney fees. 2013 S.D. 48, ¶ 21, 834 N.W.2d 337, 342. In *Roth*, we briefly discussed each party's assets and income and whether either party had unreasonably increased the amount of time spent on the case. We concluded that "considering the relative financial condition of the parties, the good faith arguments, and the closeness of the case, both parties' motions for appellate attorney fees are denied." *Id.*

[¶73.] In this vulnerable adult domestic relation case, there is significant evidence that Ramos financially exploited a vulnerable adult to the tune of approximately $300,000, and that Ramos's conduct over several years depleted Bruggeman's assets while increasing her own. These details weigh in favor of awarding appellate attorney fees to Black Hills Advocate. However, in my view, Ramos's appeal was not meritless in light of the unique facts of this case, the longstanding personal relationship between the parties, and their history of prior financial transactions. Further, based on review of the record, it does not appear that Ramos unreasonably increased the amount of time Black Hills Advocate had to

spend on this case. Because of this balance of factors, I would award half of the requested appellate attorney fees to Black Hills Advocate.

JENSEN, Chief Justice (dissenting).

[¶74.] The circuit court quashed the subpoena for perhaps the most crucial witness in this case. The court did so without personally observing or canvasing Bruggeman as to his ability to observe, recall, and communicate his recollection of events, his capacity for truthfulness, or otherwise having an adequate basis to consider these criteria. The court also failed to apply the appropriate standard for witness competency.

[¶75.] SDCL 19-19-601 provides that "[e]very person is competent to be a witness unless otherwise provided in this chapter." "Generally, every person is competent to be a witness if they have personal knowledge of the matter at hand, have sufficient understanding to receive, remember, narrate impressions and are sensible to the obligation of an oath." *State v. Warren*, 462 N.W.2d 195, 198 (S.D. 1990). The standard for witness competency is appropriately low as the law favors the presentation of all relevant evidence and testimony. *See State v. Anderson*, 2000 S.D. 45, ¶ 30, 608 N.W.2d 644, 654 ("'[D]oubts [of whether a . . . witness is competent] should be resolved concerning minimum credibility of the witness in favor of permitting the jury to hear the testimony and judge the credibility of the witness for itself.'" (quoting *State v. Marr*, 673 A.2d 452, 453 (R.I. 1996))). Further, to the extent the competency of a witness is at issue, cross-examination is an effective means to assess the witness's competency and truthfulness. *United States v. Skorniak*, 59 F.3d 750, 755 (8th Cir. 1995).

[¶76.]     While the medical reports suggest that Bruggeman has cognitive deficits, it is clear that he was able to hear, respond to, and communicate with staff and medical personnel throughout the time he was in their care.[13] Further, each monthly nursing assessment affirmatively stated that "[v]eteran denies any complaints of issues with hearing, answering questions appropriately and communicating with staff with no issues." More importantly, the medical reports fail to indicate whether Bruggeman had the ability to remember and narrate impressions about the events at issue, and whether he was able to comprehend his obligation to tell the truth. Further, Black Hills Advocate failed to present any expert assessments or testimony to show that Bruggeman was not competent to testify. Contrary to the view of the majority opinion, the assessments presented in support of the motion to quash did not determine whether Bruggeman was competent to testify. In fact, these assessments were not designed to assess his ability to testify or whether he was able to recall events relevant to the petition. Black Hills Advocate simply failed to provide an adequate basis for the court to determine that Bruggeman lacked "sufficient understanding to receive, remember,

13.     The progress notes throughout the time Bruggeman was in assisted living indicate that he was "cooperative and readily takes direction." The notes further reflect that he was generally oriented to person, place, and time, and that he was "usually" or "always" able to understand and make his needs known to staff. The progress notes also indicate that Bruggeman did not have any hearing or sight problems. The notes were introduced into evidence and available for the court to review moments after the court orally granted the motion to quash. The notes were also introduced before any witnesses were presented and before the court entered its written order granting the motion to quash. Significantly, counsel for Ramos indicated she had not seen the more than 4,000 pages of notes before they were introduced.

narrate impressions and [be] sensible to the obligation of an oath."[14] *See Warren*, 462 N.W.2d at 198. Instead, Black Hills Advocate incorrectly argued that Bruggeman was not competent as a witness because "[t]his court has declared him incompetent by appointing a guardian."

[¶77.] In the absence of an adequate record to determine witness competency, it was incumbent upon the circuit court to make further inquiry, or personally interact with Bruggeman, to assess his competency to testify. "The competency of a . . . witness presents questions very closely related to those involved with the matter of credibility of a witness. Many recognized authorities upon the law of evidence deem it doubtful policy entirely to exclude any such witnesses. *After informing itself by proper examination and observation*[,] it is within the discretionary judgment of the trial court, in the first instance, to determine the testimonial capacity and competency of such a witness." *State v. Lutheran*, 76 S.D. 561, 564, 82 N.W.2d 507, 509 (1957) (emphasis added) (citation and quotation marks omitted);

---

14. This case is unlike *Lufkins* where the circuit court found an eyewitness to a homicide was not competent to testify based upon a mental status assessment from a mental health professional who testified at the motion hearing and was subject to cross-examination. *State v. Lufkins*, 381 N.W.2d 263, 266 (S.D. 1986). The substance of the testimony and report included conclusions that the witness had a loss of intellectual functioning, suffered from hallucinations, exhibited bizarre behavior, and *most importantly, affirmatively showed that the eyewitness "did not remember the day of the [victim's] death or that the victim was dead*[.]" *Id.* (emphasis added). On appeal, this Court concluded that this evidence "sufficiently established that [witness] *had lost his personal knowledge of the events in question* and lacked the understanding to receive, remember, and narrate any remaining impressions." *Id.* (emphasis added). In contrast, the notes presented in the motion to quash affirmatively showed that Bruggeman was able to articulate the importance of his relationship with Ramos and he was able to recall the "good relationship" with Ramos and her family.

*see also State v. Guthmiller*, 2003 S.D. 83, ¶ 11, 667 N.W.2d 295, 301 ("The determination of the competency of a witness 'is left in the first instance to the discretionary judgment of the trial court, *after informing itself by proper examination.*'" (emphasis added) (citation omitted)).

[¶78.]     The circuit court also appears to have applied an incorrect standard for determining witness competency by adopting Black Hills Advocate's position that "the court previously found [Bruggeman] incompetent" because a guardian and conservator had been appointed for him.[15] However, Bruggeman has never been judicially determined to be mentally incompetent and the appointment of a guardian or conservator cannot serve as the basis for assessing whether a witness is competent to testify. A guardian may be appointed when a person is impaired such that the person "lacks the capacity to meet the essential requirements for his health, care, safety, habilitation, or therapeutic needs without the assistance or protection of a guardian." SDCL 29A-5-302. This standard does not consider whether a witness is able to observe and recall events or testify truthfully.

[¶79.]     The circuit court also relied upon the physician's opinion during the guardianship proceedings that a personal appearance by Bruggeman *could* impact his health or safety. However, the conclusory report from the guardianship

---

15.     As the majority opinion correctly notes, there had been a prior guardianship hearing and a protection order hearing. However, the transcripts and exhibits from these hearings are not in the record, and there is no indication that Bruggeman was ever personally before the court. The majority opinion can only speculate whether these prior proceedings provided the circuit court with an adequate foundation to determine Bruggeman's competency to testify in this proceeding, or whether the court somehow had greater clarity on the issue because of the prior proceedings.

proceedings gave no indication that Bruggeman could not recall the events at issue, or that his testimony could not be accommodated by other means that could "be received under the special care of the court and under guarded circumstances." *See Warren*, 462 N.W.2d at 198. Despite the request by Ramos's counsel for the court to accommodate Bruggeman's testimony by remote means, the court gave no consideration to whether other arrangements could be made to facilitate Bruggeman's testimony, such as a deposition or a remote appearance. Any suggestion by the majority opinion that his difficulties could have been heightened by such means is speculative.

[¶80.] In the end, the circuit court failed to apply the correct standard for witness competency by focusing on the standard applicable in guardianship proceedings rather than assessing whether Bruggeman had "sufficient mental capacity to observe, recollect, and communicate, and some sense of moral responsibility[.]" *Anderson*, 2000 S.D. 45, ¶ 24, 608 N.W.2d at 653. A court "necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law[.]" *Corcoran v. McCarthy*, 2010 S.D. 7, ¶ 13, 778 N.W.2d 141, 147 (citation omitted).

[¶81.] The court's decision was also prejudicial to Ramos. Black Hills Advocate sought to show throughout the hearing that Ramos committed elder abuse by neglecting Bruggeman's physical needs and taking advantage of him by purloining his money for her own use. Ramos, in contrast, testified that she thought of Bruggeman as a father for most of her life, that they had commingled their funds for many years, and that Bruggeman had a donative intent toward her,

which included giving her money to make the recent home purchase. Black Hills Advocate strongly challenged Ramos's gifting theory and attacked Ramos's credibility throughout the hearing. The record affirmatively shows that Ramos's substantial rights were affected by her inability to call Bruggeman to testify about his intentions with respect to these challenged transactions.

[¶82.] Further, in assessing prejudice, the majority opinion fails to consider that the circuit court's evidentiary error effectively granted judgment as a matter of law on the question of whether Bruggeman had the *capacity* to gift the money to Ramos. In *Stockwell v. Stockwell*, this Court applied a testamentary capacity standard to consider whether a grantor has capacity to make end of life gifts.[16] 2010 S.D. 79, ¶ 27, 790 N.W.2d 52, 62; *see also In re Est. of Long*, 2014 S.D. 26, ¶ 18, 846 N.W.2d 782, 786. *Stockwell* explained this capacity as follows:

> Testamentary capacity and competence evincing the soundness of mind required to make a will are demonstrated when, without prompting, one is able to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty, and the disposition that he desires to make of [his] property. Testamentary capacity and competence [ ] does not require that one have the intellectual vigor of youth or perfect health. Moreover, it is not necessary that a person desiring to make a will have the capacity to make contracts and do business. One may lack competency, such that in the view of medical science he is not of sound mind and memory, yet still retain the requisite competency to execute a will.

*Id.* (internal citations and quotation marks omitted).

---

16. Other courts have applied a competency standard requiring the person challenging the gift to show that "the grantor was so weak or unbalanced at the time of the execution [of the gift] that he could not understand and comprehend the purport and effect of what he was then doing." *Benell v. Ross*, 808 N.W.2d 657, 661 (Neb. Ct. App. 2012).

[¶83.] No expert testimony was offered on the question of Bruggeman's capacity to make a gift. Further, the circuit court relied upon medical reports and other documents that were not subject to cross-examination by Ramos to find that Ramos "financially exploited Bruggeman by taking and exercising control over his funds . . . ." Ramos and Bruggeman had a complicated relationship, but there was evidence of a significant bond between them that had existed for many years, and that Bruggeman wanted Ramos to have money to purchase the house. A crucial question on this record is whether Bruggeman was competent to make a gift to Ramos. Bruggeman's testimony would be critical to resolving the central issues in this case.

[¶84.] I would reverse and remand, so the circuit court can develop an adequate record and apply the correct standard to determine Bruggeman's competency to testify.